FILED
United States Court of Appeals
Tenth Circuit

February 10, 2009

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

LUIS GONZALES SANCHEZ, JR.,
a/k/a Luis Sanchez,

Defendant - Appellant.

No. 08-5047

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA
(D.C. NO. 4:07-CR-00141-JHP-2)**

---

William D. Lunn, Tulsa, Oklahoma, for Defendant - Appellant.

Jeffrey A. Gallant, Assistant United States Attorney, (David E. O'Meilia, United States Attorney, with him on the brief), for Plaintiff - Appellee.

---

Before **HARTZ**, **HOLLOWAY**, and **O'BRIEN**, Circuit Judges.

---

**HARTZ**, Circuit Judge.

---

Luis Gonzalez Sanchez Jr.[1] was standing by a vehicle in the driveway of the house of Omar Silvar when police officers arrived to execute a search warrant for the house. An officer ordered him to get down, but he fled. He was quickly apprehended, and a search of his person yielded incriminating evidence. About an hour later, after the search of the house was completed, Mr. Sanchez was formally arrested. He pleaded guilty in the United States District Court for the Northern District of Oklahoma to a charge of possession of marijuana with intent to distribute, *see* 21 U.S.C. §§ 841(a)(1) and (b)(1)(D). His plea reserved his right to appeal the denial of his motion to suppress the evidence seized from his person and Silvar's house, and he has appealed that decision.

We have jurisdiction under 28 U.S.C. § 1291 and affirm the district court's decision denying suppression. In particular, we hold as follows: (1) The search warrant for the house was lawful even though the affidavit for the warrant provided no direct evidence of criminal conduct at the house. If law-enforcement officers have probable cause to believe that a person is a supplier of illicit drugs, then the officers have probable cause to search the person's home for such contraband and evidence. (2) Officers executing a search warrant of a home may detain persons they encounter standing by a vehicle in the home's driveway. (3)

---

[1] Mr. Sanchez signed his name as Luis Sanchez Gonzalez Jr. several times in his plea agreement in district court. But to be consistent with the charging documents and other materials in this case, we refer to him as Luis Gonzalez Sanchez Jr.

In Oklahoma if such a person flees the officers after being ordered to get down, the officers have probable cause to arrest him for violation of a statute prohibiting obstruction of an officer performing his duties. (4) Officers may search the person of one who is apprehended after such flight, even though (a) the apprehended person is not formally arrested until the search of the home has been completed, and (b) the formal arrest is not for the offense of obstructing an officer. We also hold that the district court did not err in any challenged procedural rulings related to the suppression hearing.

We first address the validity of the search warrant. Then we describe the events during the execution of the warrant and explain why the officers' actions were lawful. Finally, we discuss the district court's procedural rulings at the suppression hearing.

## I.   VALIDITY OF THE SEARCH WARRANT[2]

The search warrant in question authorized officers to search for marijuana, drug paraphernalia, drug-sale proceeds, firearms, cellular telephones, pagers, records, ledgers, computers, keys, unexplained wealth, and proof of ownership at the "house, building or premises, the curtilage thereof and appurtenances thereunto belonging" at 713 South Norwood Avenue in Tulsa, Oklahoma.

---

[2] We need not address whether Mr. Sanchez has standing to challenge the warrant, because "even assuming that defendant does have standing, it is clear that there was no constitutional violation." *United States v. Scarborough*, 128 F.3d 1373, 1377 n.2 (10th Cir. 1997).

R. Vol. I Doc. 34-3 at 2. Supporting the warrant was an affidavit of Tulsa Police Department Officer Ronald Leatherman, which set forth the following information: Leatherman had a bachelor's degree in criminal-justice administration, had worked for the Tulsa Police Department for seven years, and was a narcotics investigator in the department's Special Investigations Division. He had received training in narcotics-investigation techniques from federal and Oklahoma agencies. During a two-week period a confidential informant had made multiple purchases of marijuana from a seller identified as Seth. Before each transaction Leatherman would listen to a telephone conversation between the informant and Seth in which Seth set a location for the exchange and stated that he would check with his supplier. After searching the informant's person and vehicle for drugs, surveillance officers would follow the informant to the location set by Seth and watch the informant purchase the marijuana from Seth using cash provided by the police. The informant gave the officers the marijuana he had purchased from Seth. At each transaction the officers observed a white Chevrolet pickup driven by an unknown man. The informant identified the man as Seth's supplier and said that the man gave the marijuana to Seth at the time of the buys. After one of the transactions, officers followed the man to 713 S. Norwood. He drove his truck on a circuitous but nonstop route home, a driving pattern that Leatherman described as "[a] tactic commonly used by drug dealers to avoid detection by law enforcement officials." *Id.* Doc. 34-4 at 3. Utility records

showed that Omar Silvar resided at 713 S. Norwood. A driver's license photo obtained from the Oklahoma Department of Public Safety confirmed that Silvar was the pickup driver seen by officers at the buys.

Leatherman's affidavit further states that "[t]hrough [his] training and experience, [he] ha[s] also learned that individuals that sell/distribute illegal drugs often store additional quantities of illegal drugs . . . at their residence. It is also common for individuals that distribute illegal drugs to store the money they receive from selling illegal drugs at their residence." *Id.* It goes on to say that "[t]he fact that Omar Silvar returned to his residence (without stopping at any other locations) after delivering marijuana to 'Seth' during the controlled purchases indicates that Silvar has the proceeds from selling the marijuana at his residence." *Id.*

Mr. Sanchez does not challenge the sufficiency of Leatherman's affidavit to establish probable cause that Silvar was involved in marijuana trafficking. Nor does he challenge the sufficiency of the evidence that Silvar lived at 713 S. Norwood. What he challenges is the existence of probable cause to believe that Silvar's home would contain drugs, drug paraphernalia, drug-sale proceeds, or other evidence of an offense. He argues that the affidavit does not establish that Silvar ever received the proceeds from the buys, does not establish that he was a "Mister Big" supplier (rather than a mere courier), and does not point to any illegal drug activity at 713 S. Norwood itself. We disagree.

"[P]robable cause to issue a search warrant . . . exists when the supporting affidavit sets forth sufficient facts that would lead a prudent person to believe that a search of the described premises would uncover contraband or evidence of a crime." *United States v. Rowland*, 145 F.3d 1194, 1204 (10th Cir. 1998). The magistrate presented with a warrant application must make a "practical, common-sense decision based on the totality of the circumstances as set forth in the affidavit." *Id.* (internal quotation marks omitted). We "afford . . . great deference" to the issuing magistrate's probable-cause determination unless there is "no substantial basis for concluding that probable cause existed." *United States v. Danhauer*, 229 F.3d 1002, 1006 (10th Cir. 2000) (internal quotation marks omitted).

By that standard, the affidavit was sufficient. The informant's statements, corroborated by what Leatherman heard in the telephone conversations and Silvar's presence at the buys, were sufficient evidence that Silvar was a drug supplier. And we think it merely common sense that a drug supplier will keep evidence of his crimes at his home. In *United States v. Sparks*, 291 F.3d 683, 689–90 (10th Cir. 2002), we said that when police officers have probable cause to believe that a suspect is involved in drug distribution, there is also probable cause to believe that additional evidence of drug-trafficking crimes (such as drug paraphernalia or sales records) will be found in his residence. A leading treatise notes our decision in *Sparks* as among those in which courts have not required

-6-

particular facts to support the inference that a drug trafficker keeps his supply at his residence. *See* 2 Wayne R. LaFave, Search and Seizure § 3.7(d), at 421–22 n.170 (4th ed. 2004); *cf. id.* at 421–22 ("[I]t is commonly held that this gap can be filled merely on the basis of the affiant-officer's experience that drug dealers ordinarily keep their supply, records and monetary profits at home.") (footnote omitted). Accordingly, the search warrant was supported by probable cause.

Mr. Sanchez relies on *United States v. Nolan*, 199 F.3d 1180 (10th Cir. 1999), contending that we held the search-warrant affidavit in that case inadequate "because it made no reference to the defendant conducting any of his drug activities from the house." Aplt. Br. at 19. But that is a misreading of our opinion. True, we raised the question whether probable cause to search the residence of a person suspected of drug trafficking may rest on "observations of illegal activity outside of the home . . . even in the absence of an allegation that any illegal activity occurred in the home itself." *Nolan*, 199 F.3d at 1183 (internal quotation marks omitted). We did not, however, answer this question. Rather, we left the answer for another day, affirming the use of the seized evidence at trial under the good-faith exception to the exclusionary rule. *See id.* at 1184. *Sparks*, upon which we rely, answered the question three years later.

## II.    EXECUTION OF THE WARRANT

### A.    The Events

Corporal Dale Francetic of the Tulsa Police Department began conducting surveillance of 713 S. Norwood shortly before 6 p.m. on February 23, 2007. Initially, no vehicles were present. Within a few minutes, however, Silvar, the alleged supplier, arrived in the white pickup truck that officers had seen him driving when they observed the informant's marijuana purchases. Silvar backed the truck, whose cargo bed carried some boxes, into the driveway of the residence. Mr. Sanchez then arrived in a red Chevrolet pickup truck. Officers had seen this truck outside Silvar's residence while conducting surveillance on at least one prior occasion, but had not seen Mr. Sanchez himself. Soon afterwards a man later identified as David Saldivar arrived in a white Ford Mustang. Francetic drove by the house. Seeing no one in the front yard or in the vehicles, he assumed that the men were inside the house.

At about 7 p.m. Leatherman, leading eight other officers, approached the house on foot to serve the search warrant. (Francetic remained parked a block away to intercept anyone who might flee the scene.) Silvar, Mr. Sanchez, and Saldivar were standing in the driveway behind Silvar's truck, apparently unloading the boxes. Leatherman announced that the officers were with the Tulsa Police Department and that they had a search warrant. He ordered the men to get on the ground. Mr. Sanchez and Saldivar ran. Mr. Sanchez covered only a short

distance before he was caught, handcuffed, and searched. Officers seized from his pockets $2,036 in cash, a cell phone, and a set of keys. They later determined that one of the keys opened the house's front door and that the cell phone contained an image of Mr. Sanchez holding a firearm similar to one found in the house. The search of the house yielded, among other items, about $5,000 in cash, 430 grams of marijuana (some of it packaged for sale), an unloaded .45-caliber machine-gun pistol, a loaded .38-caliber revolver, boxes of ammunition for both weapons, digital scales on which marijuana residue was present, and boxes of plastic baggies. At 8 p.m., after the officers had completed the search, Mr. Sanchez was formally arrested for possession of marijuana with intent to distribute, possession of a firearm during the commission of a felony, failure to have a tax stamp for the marijuana, and resisting arrest.

## B. Discussion

Mr. Sanchez's sole challenge to the execution of the warrant is to the search of his person when he was apprehended after fleeing. In our view, the search was valid as incident to an arrest that could be justified for the Oklahoma offense of obstructing an officer. To reach that conclusion we must examine (1) the officers' authority to detain Mr. Sanchez as they approached the house to execute the warrant; (2) whether Mr. Sanchez's flight constituted obstructing an officer, in violation of Oklahoma law; and (3) whether the search of Mr. Sanchez can be justified as a search incident to arrest even though (a) the formal arrest

-9-

occurred about an hour after the search and (b) Mr. Sanchez was formally arrested for offenses other than obstructing an officer. We discuss these issues in turn.

### 1. Authority to Detain Mr. Sanchez

The leading case on the authority of police officers to detain persons while executing a search warrant is the Supreme Court's opinion in *Michigan v. Summers*, 452 U.S. 692 (1981). In *Summers* the defendant was descending the front steps of a house when officers arrived to execute a search warrant. *See id.* at 693. The officers detained him during their search. After finding narcotics and then determining that he owned the house, they arrested him. *See id.* at 693 n.1. A search of defendant's person incident to that arrest yielded heroin, which he sought to suppress. *See id.* at 694.

The Supreme Court held that the officers had the authority to detain Mr. Summers as they searched the house, regardless of the absence of any specific information about Mr. Summers personally. Several considerations led to this conclusion. One was the protection afforded by the search warrant itself:

> [The warrant] provides an objective justification for the detention. A judicial officer has determined that police have probable cause to believe that someone in the home is committing a crime. Thus a neutral magistrate rather than an officer in the field has made the critical determination that the police should be given a special authorization to thrust themselves into the privacy of a home. The connection of an occupant to that home gives the police officer an easily identifiable and certain basis for determining that suspicion of criminal activity justifies a detention of that occupant.

*Id.* at 703–04 (footnote omitted). In addition, the detention of an occupant of the premises that is implicitly authorized by the search warrant, "although admittedly a significant restraint on his liberty, [is] surely less intrusive than the search itself." *Id.* at 701. Not only would most occupants wish to remain to observe the search, but the officers are unlikely to exploit the detention to gain information "because the information the officers seek normally will be obtained through the search and not through the detention." *Id.* And the stigma of the detention is unlikely to add much to the stigma created by the search itself. *See id.* at 702. Finally, the need for detention is compelling:

> Most obvious is the legitimate law enforcement interest in preventing flight in the event that incriminating evidence is found. Less obvious, but sometimes of greater importance, is the interest in minimizing the risk of harm to the officers. . . . The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation. Finally, the orderly completion of the search may be facilitated if the occupants of the premises are present. Their self-interest may induce them to open locked doors or locked containers to avoid the use of force that is not only damaging to property but may also delay the completion of the task at hand.

*Id.* at 702–03 (citation omitted).

These considerations justify detention as a matter of course. Weighing them is not to be a case-by-case process. Rather, the rule adopted in *Summers* "does not depend upon such an ad hoc determination, because the officer is not required to evaluate either the quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure." *Id.* at 705 n.19.

The issue arose again in *Muehler v. Mena*, 544 U.S. 93 (2005), which elaborated on the *Summers* doctrine. In *Muehler* the police obtained a warrant to search what was believed to be the house of a gang member who had participated in a recent drive-by shooting. *See id.* at 95. The warrant authorized officers to search for deadly weapons and evidence of gang membership, among other items. *See id.* at 95–96. When the warrant was executed, Mena, one of the house's occupants, was awakened at gunpoint by SWAT-team officers and handcuffed. *See id.* at 96. The officers also detained three other persons they encountered in trailers in the property's back yard. *See id.* at 107 (Stevens, J., concurring). Mena and the other detainees were moved to a converted garage, where they were held in handcuffs for the duration of the search. *See id.* at 96 (majority opinion). Mena sued the officers who oversaw the warrant's execution under 42 U.S.C. § 1983, claiming that she had been "detained for an unreasonable time and in an unreasonable manner" (that is, in handcuffs), in violation of her Fourth Amendment rights. *Id.* at 96 (internal quotation marks omitted).

The Court held that the detentions were reasonable. *See id.* at 99. The Court relied on the holding in *Summers* "that officers executing a search warrant for contraband have the authority 'to detain the occupants of the premises while a proper search is conducted.'" *Id.* at 98 (quoting *Summers*, 452 U.S. at 705). It summarized *Summers*'s reasoning as follows:

Such detentions are appropriate . . . because the character of the additional intrusion caused by detention is slight and because the justifications for detention are substantial. . . . [T]he detention of an occupant is "surely less intrusive than the search itself," and the presence of a warrant assures that a neutral magistrate has determined that probable cause exists to search the home. Against this incremental intrusion, . . . three legitimate law enforcement interests . . . provide substantial justification for detaining an occupant: "preventing flight in the event that incriminating evidence is found"; "minimizing the risk of harm to the officers"; and facilitating "the orderly completion of the search," as detainees' "self-interest may induce them to open locked doors or locked containers to avoid the use of force."

*Id.* (citations omitted) (quoting *Summers*, 452 U.S. at 701–03). (We note that the third justification apparently is not a critical one, because Mena and the other three detainees were held in the garage during the search and she was never asked to assist in opening cabinets and dressers that the officers forced open. *See id.* at 107 n.5 (Stevens, J., concurring)). The Court emphasized that the authority to detain is not dependent on specific information in the particular case. "An officer's authority to detain incident to a search is categorical; it does not depend on the 'quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.'" *Id.* at 98 (majority opinion) (quoting *Summers*, 452 U.S. at 705 n.19).

Some language in the two opinions could be read to support the view that officers can detain only residents of the premises to be searched. In particular, *Summers* observes that "because the detention in this case was in [Summers's] own residence, it could add only minimally to the public stigma associated with

-13-

the search itself." 452 U.S. at 702. But this relative-stigma calculus could not

have been essential to the holding. To begin with, the Court uses the term

*occupant* rather than *resident* to describe those who can be detained. *Muehler*

states *Summers*'s holding as authorizing officers "'to detain the occupants of the

premises.'" *Muehler*, 544 U.S. at 98 (quoting *Summers*, 452 U.S. at 701). In

common speech, an occupant could be anyone present on the premises, such as a

visitor or even a salesperson. An "occupant" of an automobile need not be an

owner or renter of the vehicle. *See* Oxford English Dictionary 681 (2d ed. 1989)

("Occupant, n.1-a. [a] person . . . who occupies, resides in, *or is at the time in (a*

*place)*; . . . . (emphasis added)). More importantly, the Court does not explain

how officers are to determine whether a person on the premises is a resident.

(Could the officers in this case have anticipated that Mr. Sanchez would be

carrying a key to the front door?) Surely the officers are not bound to credit the

person's representations on the matter. And the Court strongly indicates that

specific facts implicating the occupant are not necessary; the authority to detain

"does not depend on the 'quantum of proof justifying the detention.'" *Muehler*,

544 U.S. at 98 (quoting *Summers*, 452 U.S. at 705 n.19). We therefore conclude

that the authority to detain relates to all persons present on the premises. *See*

*United States v. Pace*, 898 F.2d 1218, 1238–39 (7th Cir. 1990) (law-enforcement

interests set out in *Summers* justified detention of guests present in condominium

when officers executed search warrant, despite the fact that detainees were not residents of the condominium).

Thus, *Summers* and *Muehler* convince us that the officers executing the search warrant had the authority to detain Mr. Sanchez. He argues that his situation is different from those in *Summers* and *Muehler* because there was no direct evidence that he had been in the home to be searched. But that distinction, in our view, is not compelling. As in the Supreme Court cases, the principal protection afforded Mr. Sanchez is that the warrant was supported by a neutral magistrate's determination of probable cause. Also, the officers had no more cause than in those cases to extend or exploit the detention. And the requisite justifications supporting detention were present here: Detention was necessary to prevent flight and minimize danger. The occasion called for the "routine[] exercise [of] unquestioned command of the situation." *Summers*, 452 U.S. at 703. Although Mr. Sanchez may not have been inside the home, he was on the premises to be searched (which included the home's curtilage). He was clearly not just a passerby; he and Saldivar were with Silvar, the home's owner, by Silvar's truck in the home's driveway, apparently unloading boxes. In the *Summers/Muehler* context we see no principled reason to distinguish a visitor in the home from one engaged with the owner in the area immediately surrounding the home. Other circuits have likewise permitted the detention of a person whom officers had not seen enter or leave the home where a search warrant was being

-15-

executed, but whose presence at the scene raised a concern about interference with the search. *See, e.g.*, *United States v. Jennings*, 544 F.3d 815, 818–19 (7th Cir. 2008) (upholding under *Summers* the detention of defendant who drove up to building to be searched and parked within SWAT team's security perimeter moments before search began, because officers were "reasonably concerned for their own and for [defendant]'s safety, as well as for any activity that might compromise the search," even though defendant "never stepped onto the property being searched"); *United States v. Bohannon*, 225 F.3d 615, 616–17 (6th Cir. 2000) (detention of nonresident who arrived at trailer as officers were wrapping up search was lawful under *Summers*, even though nonresident was detained outside trailer itself; *Summers*'s officer-safety rationale applies when any person seeks entry to a place being searched); *Baker v. Monroe Twp.*, 50 F.3d 1186, 1191–92 (3d Cir. 1995) (relatives of resident of apartment searched in DEA raid were lawfully detained immediately outside the apartment as they arrived for dinner).

Finally, because officers had the right to detain Mr. Sanchez during their search, they had the right to order him to get down. Such an order is a reasonable means of effecting *Summers*'s aims of preventing flight and minimizing the risk of harm by the "officers routinely exercis[ing] unquestioned command of the situation." 452 U.S. at 703; *see Burchett v. Kiefer*, 310 F.3d 937, 943–44 (6th Cir. 2002) (person who approached—but did not set foot on—premises being

searched was properly ordered to get on the ground, and officers had right to apprehend and detain him when he fled rather than comply with their order).

### 2. Mr. Sanchez's Flight as Obstruction of an Officer

When officers ordered Mr. Sanchez to get down, he fled. We now consider whether his flight violated Oklahoma's statute prohibiting obstruction of an officer, thereby providing grounds for an arrest and, more importantly, a search incident to arrest.

Okla. Stat. Ann. tit. 21, § 540 states that "[e]very person who willfully delays or obstructs any public officer in the discharge or attempt to discharge any duty of his office, is guilty of a misdemeanor." The Oklahoma courts have interpreted the statute in a common-sense manner. For example, in *Trent v. State*, 777 P.2d 401 (Okla. Crim. App. 1989), the court considered the conduct of a passenger after a traffic stop for driving under the influence. The passenger refused to leave the scene and engaged in "loud and angry" verbal harassment of the officer. *Id.* at 402–03. The court held that this conduct violated the statute because the passenger's actions prevented the officer from removing the driver's vehicle from the road and timely testing the driver's blood-alcohol level. *See id.* at 403. And in *Marsh v. State*, 761 P.2d 915, 916 (Okla. Crim. App. 1988), the court held that a false statement to an officer had impeded the officer's investigation of a child's death and thus constituted obstruction.

-17-

Mr. Sanchez's flight unquestionably impeded the officers executing the search warrant. Rather than conducting the search, they needed to chase and apprehend him. Various courts, interpreting statutes similar to Okla. Stat. Ann. tit. 21, § 540, have held that flight can constitute obstruction of an officer. "[F]light, or attempted flight, after a command to halt constitutes obstruction of an officer." *In re E.G.*, 648 S.E.2d 699, 701 (Ga. Ct. App. 2007) (internal quotation marks omitted); *see United States v. Gonzalez*, 71 F.3d 819, 826–27 (11th Cir. 1996) (defendant's flight from agents gave them probable cause to arrest him for violating 18 U.S.C. § 111(a)(1), which prohibits "forcibly assault[ing], resist[ing], oppos[ing], imped[ing], intimidat[ing], or interfer[ing] with" any federal officer); *People v. Allen*, 167 Cal. Rptr. 502, 505 (Cal. Ct. App. 1980) (officer had probable cause to arrest defendant for obstruction because defendant, knowing that the officer wanted to talk with him, ran and attempted to hide). Mr. Sanchez suggests that the officers should simply have let him go and proceeded to execute the search warrant. But we have already noted the compelling law-enforcement and safety considerations that justify detention in these circumstances.

Mr. Sanchez argues that his flight did not violate Oklahoma law because the statute requires "a belligerent act directed at an officer individually." Reply Br. at 11. He relies on language in *Knoff v. State*, 192 P. 596 (Okla. Crim. App. 1920), that obstructing an officer "does not mean to oppose or impede the process

with which the officer is [concerned], or to defeat its execution, but [rather] that the officer himself shall be obstructed." *Id.* at 597. The holding in *Knoff*, however, is unremarkable. The defendant was charged with obstructing a constable "from levying on a certain amount of cotton," *id.* at 596 (internal quotation marks omitted), and the court reversed the conviction because the constable testified that "he had accomplished the purpose of levying" before the defendant engaged in the allegedly obstructing conduct, *id.* at 597. In any event, to the extent that language in *Knoff* could be read to support a requirement that belligerence or the like is required for obstruction, that requirement is not now good law in Oklahoma. *Knoff*'s language relied on *Ratcliff v. State*, 158 P. 293 (Okla. Crim. App. 1916) (no violation of the statute because defendant did not know that the cow he retrieved had been taken by an officer through execution); and *Trent* explicitly overruled *Ratcliff* insofar as it indicated that obstruction requires the use of physical force, *Trent*, 777 P.2d at 402. The view of obstruction taken in *Trent* and *Marsh* clearly encompasses Mr. Sanchez's flight.

### 3. Search Incident to Arrest

#### a. Timing of Arrest

The government contends that the search of Mr. Sanchez was a lawful search incident to arrest. There is no dispute that Mr. Sanchez was arrested, and we have already held that there was probable cause to arrest him before he was searched. The difficulty is that the Supreme Court has said that a search incident

to arrest must be "substantially contemporaneous" with the arrest, *Shipley v. California*, 395 U.S. 818, 819 (1969) (per curiam) (internal quotation marks omitted), and the magistrate judge, whose findings were adopted by the district court, assumed that Mr. Sanchez had been searched immediately upon being apprehended after fleeing, which he estimated to be about an hour before the formal arrest.

The government argues that the search and arrest were "substantially contemporaneous" despite the one-hour gap. It notes our statement in *United States v. Torres-Castro*, 470 F.3d 992 (10th Cir. 2006), that "courts have found that a search may be incident to an arrest in cases where the search and arrest were separated by times ranging from five to sixty minutes." *Id.* at 998. In the two cases that we cited in support of that statement, *United States v. McLaughlin*, 170 F.3d 889 (9th Cir. 1999), and *United States v. Hrasky*, 453 F.3d 1099 (8th Cir. 2006), the search was conducted after the arrest; but a search incident to arrest can also precede the arrest if probable cause for the arrest preceded the search (rather than being justified by the fruits of the search). *See Rawlings v. Kentucky*, 448 U.S. 98, 111 (1980).

An hour would seem to be at the outer limits of "substantially contemporaneous," if not beyond. In the context of this case, however, the government's argument is an attractive one. The hour delay resulted from the officers' pursuing their primary mission—executing the search warrant. To delay

the formal announcement of an arrest while that effort is underway strikes us as eminently reasonable:  the sooner the search is completed, the sooner the intrusion from the search will end; and the formality of the arrest accomplishes little when the person to be arrested is already being detained.

Nevertheless, we do not rely on the contention that two events an hour apart may be "substantially contemporaneous."  Rather, we note that for search-incident-to-arrest purposes we may deem the arrest to have occurred before the formal announcement to a suspect that he is under arrest.  To be sure, it appears that there can be no search incident to arrest unless the suspect is at some point formally placed under arrest.  *Cf. Knowles v. Iowa*, 525 U.S. 113 (1998) (there is no right to search incident to a traffic citation, even if officers could have lawfully arrested the defendant rather than issuing a citation); *United States v. Ward*, 682 F.2d 876, 880 (10th Cir. 1982) (search of defendant not justified as incident to arrest; defendant was not arrested, even though there was probable cause to believe that he was committing an offense).  But the arrest itself, for constitutional purposes, may be said to have occurred well before that formality.

Particularly instructive in this regard is *Sibron v. New York*, 392 U.S. 40 (1968).  The Supreme Court upheld the search of one Peters as incident to an arrest.  It summarized the relevant facts as follows:

> Officer Samuel Lasky of the New York City Police Department . . .
> was at home in his apartment . . . at about 1 p.m. on July 10, 1964.
> He . . . heard a noise at his door. . . .  [W]hen he . . . looked through

the peephole into the hall, Officer Lasky saw "two men tiptoeing out of the alcove toward the stairway.". . . Believing that he had happened upon the two men in the course of an attempted burglary, Officer Lasky opened his door, entered the hallway and slammed the door loudly behind him. This precipitated a flight down the stairs on the part of the two men, and Officer Lasky gave chase. . . . [H]e apprehended Peters between the fourth and fifth floors. . . . Officer Lasky patted Peters down for weapons, and discovered a hard object in his pocket. He stated at the hearing that the object did not feel like a gun, but that it might have been a knife. He removed the object from Peters' pocket. It was an opaque plastic envelope, containing burglar's tools.

*Id.* at 48–49 (footnotes omitted). The Court held that the arrest occurred when the officer seized Peters:

[I]t is clear that the arrest had, for purposes of constitutional justification, already taken place before the search commenced. When the policeman grabbed Peters by the collar, he abruptly "seized" him and curtailed his freedom of movement on the basis of probable cause to believe that he was engaged in criminal activity. At that point he had the authority to search Peters, and the incident search was obviously justified by the need to seize weapons and other things which might be used to assault an officer or effect an escape, as well as by the need to prevent the destruction of evidence of the crime.

*Id.* at 67 (citation and internal quotation marks omitted). The Court was not concerned with how long after that seizure it was before the officers formally informed Peters of his arrest. *Cf. id.* at 77 (Harlan, J., concurring) (in this context, "the prosecution must be able to date the arrest as early as it chooses following the development of probable cause."); 3 Wayne R. LaFave, Search and Seizure § 5.1(a), at 12–13 (same). We can infer that in the very similar situation in this case, the arrest of Mr. Sanchez was initiated (for purposes of the search-

incident-to-arrest doctrine) when the officers apprehended him after his flight. The search of Mr. Sanchez was promptly after his arrest, and can readily be characterized as "substantially contemporaneous." Accordingly, the search of Mr. Sanchez was a lawful search incident to arrest.

### b. Stated Grounds for Arrest

It is irrelevant that Mr. Sanchez was arrested for, among other things, resisting arrest rather than obstruction of an officer. "[T]he legitimate basis for an arrest is purely an objective standard and can be for *any crime*, not merely that for which the defendant is ultimately charged." *Torres-Castro*, 470 F.3d at 998; *see also Devenpeck v. Alford*, 543 U.S. 146, 154–55 (2004) ("Those are lawfully arrested whom the facts known to the arresting officers give probable cause to arrest."). Indeed, "[w]hether or not the officer intended to actually arrest the defendant at the time of the search [incident to that arrest] is immaterial" to our inquiry. *United States v. Anchondo*, 156 F.3d 1043, 1045 (10th Cir. 1998). Thus, it does not matter that the stated grounds for Mr. Sanchez's formal arrest did not include obstruction of an officer. *See United States v. Lugo*, 170 F.3d 996, 1000, 1003 (10th Cir. 1999) (probable cause to arrest defendant, and thus authority to search his vehicle's passenger compartment incident to arrest, arose from speeding violation and failure to produce a driver's license, but defendant was ultimately arrested only for possession of drugs found during search).

## III. CONDUCT OF SUPPRESSION HEARING

Finally, Mr. Sanchez challenges the district court's procedural rulings at the pretrial hearing on his motion to suppress. The evidence at the suppression hearing consisted of the search warrant, Officer Leatherman's report, and Leatherman's testimony.

Mr. Sanchez contends that the district court's ruling on his motion to suppress "relied too much on the hearsay of Corporal Francetic and others contained in the police report." Aplt. Br. at 17. But, as Mr. Sanchez acknowledges, the law is clear that hearsay evidence is admissible at suppression hearings. *See United States v. Miramonted*, 365 F.3d 902, 904 (10th Cir. 2004). Mr. Sanchez argues that the report was unreliable because Leatherman's suppression-hearing testimony contradicted the report's contents "in several critical matters." Aplt. Br. at 15. We disagree. The report's statement that Mr. Sanchez, Silvar, and Saldivar were carrying boxes into 713 S. Norwood when the police arrived is not inconsistent with Leatherman's testimony that he never saw Mr. Sanchez enter the house, because the report did not purport to rely only on observations by Leatherman, as opposed to other officers. And the report's listing of the four offenses for which Mr. Sanchez was arrested is not contradicted by Leatherman's testimony that Mr. Sanchez was arrested for marijuana and weapons offenses, because Leatherman's testimony did not purport to give an

exhaustive list of the bases for Mr. Sanchez's arrest. The district court could properly have found that the report was reliable.

We likewise reject Mr. Sanchez's argument that the government's use of Leatherman's report was improper because Mr. Sanchez "had subpoenaed the actual witnesses and evidence for the hearing and not had his subpoena honored." Aplt. Br. at 13–14. Our review of the record indicates that his subpoena was honored and that Mr. Sanchez was not denied the opportunity to question any witnesses or to introduce any evidence.

## IV.    CONCLUSION

We AFFIRM the judgment of the district court.