**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 22, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

DARYL LEE INGRAM, a/k/a Black, a/k/a
Clacc, a/k/a Ninety Black, a/k/a BJ,

    Defendant - Appellant.

No. 16-6221
(D.C. No. 5:15-CR-00093-M-1)
(W.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HARTZ**, **PHILLIPS**, and **MORITZ**, Circuit Judges.
_____

This appeal is one of two in which Daryl Lee Ingram challenges the drug and

money-laundering convictions that landed him concurrent life-without-release

sentences in federal prison. Here, Ingram disputes the district court's denial of two

pre-trial motions: (1) a motion to suppress evidence discovered during a search of his

home and (2) a motion for a *Franks v. Delaware* hearing.

At bottom, Ingram makes a single contention: that the Fourth Amendment

required the suppression of the evidence seized from his home. (A *Franks* hearing,

after all, is just another way to gain the protection of the Fourth Amendment's

---

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

exclusionary rule.) Yet after reviewing the search warrant and underlying affidavit, we conclude that even if the affidavit failed to prove that criminal activity was afoot at Ingram's home, law enforcement was entitled to rely on the warrant in good faith, to search the house, and to seize the evidence found there. Exercising jurisdiction under 28 U.S.C. § 1291, we thus affirm.

## BACKGROUND

In November 2014, Detective Matthew McRorie of the Oklahoma City Police Department submitted to the Oklahoma County District Court a probable-cause affidavit requesting authority to search a house located at 11009 North Miller Avenue, where Ingram and his girlfriend allegedly resided, for evidence of a drug-trafficking conspiracy run by the Rollin' 90's gang. This affidavit was only a piece of "Operation Rollin' Rock," a multi-agency investigation into the gang. *See* R. Vol. 2 at 503. But the affidavit led to a search warrant, and the execution of that search warrant culminated in the seizure of (among other things) $10,388.25 in cash, a handwritten ledger itemizing $48,200 in drug debts, tax returns in the name of Ingram's girlfriend, and paperwork from the Oklahoma Department of Corrections in Ingram's name.

The government, in turn, used this (and much other) evidence at two jury trials (the first in June 2015, the second in April 2016), eventually securing Ingram's convictions for one count of possession with intent to distribute cocaine base, one count of conspiracy to possess with intent to distribute cocaine base, one count of aiding and abetting the manufacture of cocaine base, one count of conspiracy to

2

launder money, and two counts of aiding and abetting money laundering. And in July 2016, the district court sentenced Ingram to two concurrent life-without-release prison terms, one for the possession-with-intent-to-distribute charge and one for the conspiracy-to-possess-with-intent-to-distribute charge, plus concurrent, term-of-months sentences on the remaining charges.[1]

Ingram now challenges Detective McRorie's affidavit—its sufficiency and truthfulness—in an attempt to suppress the evidence seized at 11009 North Miller and, ultimately, win the reversal of his convictions. The affidavit therefore lies at the heart of this appeal, so we thoroughly review its contents.

The affidavit begins by identifying the single-family home at 11009 North Miller Avenue in Oklahoma City. It then asserts the presence, inside the house, of items subject to seizure under Oklahoma's drug laws, specifically:

- "Documents related to a conspiracy to distribute Controlled Dangerous Substances to include but not limited to letters for coconspirators, photographs depicting coconspirators, telephone records." R. Vol. 2 at 424.

- "Items associated with membership in the 90's street gang to include but not limited to blue bandanas, blue clothing, University of North Carolina Chapel Hill apparel, letters from other 90 [sic] gang members, photographs with other 90's gang members." *Id.*

- "Documents related to the distribution of illegal drugs to include but not limited to: records, ledgers, address books, telephone books, telephone

---

[1] Ingram had three prior convictions for felony drug offenses. Thus, because the jury in this case found that Ingram conspired to possess (and possessed) with the intent to distribute at least 280 grams of "a mixture or substance containing a detectable amount of cocaine base," R. Vol. 1 at 353, federal law required that he be sentenced to "a mandatory term of life imprisonment without release" on each conviction. 21 U.S.C. § 841(b)(1)(A)(iii).

3

bills, telephone records, rent receipts, rental car agreements, mini-storage receipts, cellular telephone agreements, pager rental agreements, bills and receipts related to cellular telephones and pagers, and any property and/or U.S. currency being proceeds of or related to the distribution of illegal narcotics." *Id.*

- "Also ledgers containing quantity of narcotics possessed, ledgers of money owed to the suspects for narcotics they have provided to co-conspirators, ledgers of money owed by the suspects to their suppliers, transportation and distribution instructions for the narcotics being sold, and other types of documentation regarding the sale of narcotics." *Id.*

- "Cellular phones, sim cards, and devices capable of storing digital media (to include but not limited to smart phones, personal data assistants, hard drives and USB drives)." *Id.*

- "Financial documents related to the distribution of controlled dangerous substances to include but not limited to stored value cards, wire transfer receipts, bank account statements, bank deposit slips, documents showing purported income." *Id.*

- "And articles of personal property tending to establish the identity of the person or persons in control or possession of the place or vehicle, including, but not limited to, utility company receipts, rent receipts, canceled mail envelopes, vehicle registration, credit card receipts, repair bills, photographs, keys, and articles of clothing[.]" *Id.*

Next, the affidavit lays out the facts supporting these assertions.

First, the affidavit describes Detective McRorie's background as an Oklahoma City police officer, including his training and experience related to "[c]riminal [s]treet [g]angs," *id.* at 426, and "[d]rug [o]rganizations," *id.* at 428. Based on his participation in other investigations, he knew, for instance, that "drug dealers maintain books, records, receipts, notes, ledgers, money orders, and other papers relating to the transportation, ordering, sale and distribution of controlled substances." *Id.* at 428. And "[t]he most likely place for documents associated with

4

drug trafficking" to be found, according to the detective, "is at the primary residence of the person involved in the trafficking." *Id.* at 430.

Second, the affidavit provides an overview of the organization that law enforcement dubbed the "90's Street Gang Drug Conspiracy." *Id.* at 432. From the late 1980s, when the gang began operating in Oklahoma City, through the present day, Detective McRorie claims that gang members have been involved in drug distribution. *Id.* Furthermore, at the time of the affidavit, the gang's leadership comprised Ingram and his several "lieutenants." *Id.*

Third, the affidavit provides the details of Detective McRorie's investigation, starting with the statements of three cooperating witnesses, two of whom were gang members and all of whom were convicted felons either trading information for money or hoping to receive "consideration" on pending charges. *Id.* at 433–35. (The non-gang member, Detective McRorie noted, had provided information in the past that had led to the arrest and felony-charging of five people.) Between March and October 2014, all three informants had told police, based on their personal observations, that Ingram headed the gang and distributed "kilogram quantities" of cocaine base in Oklahoma City. *Id.* at 434–35. One of the informants, a gang member who asserted that Ingram "call[ed] the shots" for the gang, also claimed to have observed Ingram and a lieutenant in a car with "more crack in the center console . . . than [the informant] had ever seen at one time." *Id.* at 434–35. And the other gang member–informant, who had "a close personal relationship" with Ingram and "an intimate knowledge of the inner working of Ingram's drug organization," professed

to have seen Ingram give another gang member two ounces of cocaine at a mall where, the informant said, Ingram "often" sold drugs. *Id.* at 435–6.

The affidavit then discusses law enforcement's independent investigation into the informants' statements, primarily surveillance of cars tied to Ingram and other members of the gang, as well as a known "stash apartment." *Id.* at 437–39. "Almost every day" after police installed a pole camera outside the stash apartment in October 2014, police saw a car parked nearby that Ingram had previously been seen driving. *Id.* at 437. And throughout October and early November, cars associated with gang members traveled to and from the stash apartment and other locations affiliated with the gang. On October 30, for example, one gang member's car left the stash apartment, drove to 11009 North Miller, and returned to the stash apartment. Four days later, police watched as Ingram and two others left a motel room in the "Meridian corridor," a place associated with "rampant drug activity." *Id.* at 439.

In addition, the affidavit lists and describes six other search warrants associated with the case that were executed between April and October 2014. At each of the places searched, police found drugs and ties to the gang (such as photographs depicting members, including Ingram, displaying gang hand signs). Often, officers found large amounts of cash, and sometimes guns, too. In listening to jail phone calls following the searches, police also heard several incarcerated gang members ask people on the outside whether Ingram would bail them out.

Finally, the affidavit notes eight earlier drug arrests involving gang members, four involving Ingram. The earliest occurred on September 20, 1998, when the police

6

"made contact" with Ingram and two other gang members sitting in a car. *Id.* at 443. Officers arrested one of the other gang members on a gun charge, and an inventory search of the car turned up 26.5 grams of cocaine base, 5.5 grams of marijuana, and "one marijuana blunt." *Id.* Then, about six years later, Ingram arrived by cab at a house where officers had just detained his girlfriend. Inside the house, officers had seized 3.4 grams of cocaine base, baking soda, a bowl coated with cocaine HCl residue, three pistols, and close to $50,000. Ingram tried to speed away when the officers approached but was eventually stopped and arrested. Similarly, law enforcement seized "a large amount of cocaine," dishes and a hand-mixer with "residue," and over $20,000 in cash from a hotel room where Ingram had been staying. *Id.* at 444. This incident happened only three months after police found Ingram, several other gang members, and 13.6 grams of crack inside a house, as well as a pistol in a car parked outside. The remaining searches (the most recent in February 2012) turned up similar amounts of cash, drugs, and guns, as well as Rollin' 90's members other than Ingram.

After summarizing these facts, the affidavit states,

[Y]our affiant believes there has been an ongoing conspiracy by members of the 90's street gang to distribute controlled dangerous substances since at least September 20, 1998. . . . Leadership of the gang is responsible for taking actions to further the goals of the drug conspiracy such as bonding members out of jail and contributing monies to incarcerated members [sic] inmate trust accounts. Despite incarceration of various members of the conspiracy, the conspiracy has been able to thrive. *Id.* at 446.

7

Under the heading, "Nexus to 11009 North Miller," the affidavit then attempts to connect the Rollin' 90's gang's criminal activity to the house at 11009 North Miller and to Ingram. *Id.* at 446. Citing the informants' statements and law enforcement's "independent investigation," the affidavit claims that Ingram headed the gang's drug conspiracy. *Id.* Then, the affidavit recites the following facts linking Ingram to 11009 North Miller: (1) paperwork placed the house's utilities in the name of Ingram's girlfriend, (2) an informant asserted that the house was Ingram's primary residence, and (3) an officer observed a car that Ingram was known to drive parked inside the garage. Based on these facts, the affidavit concludes that 11009 North Miller was Ingram's primary residence. *Id.*

The affidavit then repeats Detective McRorie's belief that "the most likely place for a drug trafficker to keep records pertaining to their [sic] criminal activity and conspiratorial evidence is at their [sic] primary residence." *Id.* at 446. In support of this conclusion, the affidavit notes, among other things, that (1) "to thwart law enforcement" from tying them to contraband, "[h]igh level drug traffickers" typically don't keep drugs in their homes but that (2) at the same time, traffickers typically don't destroy documentary evidence of drug distribution unless they think that a search is imminent, both because such evidence is necessary for their business's continued operation and because the traffickers think that it's less incriminating than "readily apparent contraband," such as drugs. *Id.* at 446–47. Finally, "[a]ll reasonable inferences [as] to where a criminal would likely keep such evidence," based on the

8

"hundreds" of searches that the detective had conducted, pointed to the drug trafficker's primary residence. *Id.* at 447–48.

The affidavit then states, "Based on the above information, in [Detective McRorie's] opinion, there is probable cause to believe that [Ingram, his girlfriend, and others] are involved in illegal activities, such as drug trafficking" and that "the aforementioned objects" (presumably, the evidence discussed at the beginning of the affidavit) could be found at 11009 North Miller. *Id.* at 448. The affidavit thus requests a search warrant for the house.

Detective McRorie presented the affidavit to the Oklahoma County District Court on November 6, 2014. The court issued it that same day, and police executed it the next. As mentioned above, they found the predicted documentary evidence, including large amounts of cash, a drug ledger, and paperwork linking Ingram and his girlfriend to the house.

Ingram moved to suppress this evidence, to set a *Franks v. Delaware* hearing, and to suppress an arrest warrant issued by the Oklahoma County District Court. The federal district court denied all three requests, concluding that (1) the search-warrant affidavit contained sufficient probable cause, (2) the items seized from Ingram's house should not be suppressed, and (3) Ingram's motion to suppress the arrest warrant was moot because the warrant was never executed (police arrested Ingram during a traffic stop).

Ingram now argues that the district court erred in refusing to suppress the evidence discovered at 11009 North Miller.

9

## DISCUSSION

In arguing that the evidence discovered during the search of 11009 North Miller should have been suppressed, Ingram attacks both the sufficiency and the truthfulness of Detective McRorie's affidavit. As to sufficiency, Ingram claims that the affidavit failed to provide a nexus between the suspected criminal activity (drug trafficking) and the place to be searched (11009 North Miller). And as for truthfulness, Ingram contends that Detective McRorie misled the Oklahoma County District Court by failing to mention (1) that Ingram had spent eight of the nine years leading up to the search in prison and (2) that simultaneously, two other members of the alleged drug-trafficking conspiracy had also been imprisoned for considerable periods. In response, the government defends the state court's probable-cause determination and, in the alternative, contends that the good-faith exception to the exclusionary rule should apply.[2]

On review of a district court's suppression ruling, we accept the court's factual findings unless they are clearly erroneous and review questions of law de novo. *United States v. Gonzales*, 399 F.3d 1225, 1228 (10th Cir. 2005). The pertinent questions here—Was the search warrant supported by probable cause? Did the good-faith exception apply?—are both questions of law. *Id.* But if we determine that the good faith exception applies, then we need not decide whether the search-warrant

---

[2] In an alternative to its alternative argument, the government urges us to hold that any error in admitting the evidence seized from 11009 North Miller was harmless given the overwhelming weight of evidence against Ingram. Because we resolve the good-faith issue in the government's favor, we don't reach this alternative argument.

was supported by probable cause. Thus, we have discretion to skip the probable-cause question and proceed directly to good faith. *Id.* We choose to follow that path here, so we evaluate Ingram's claims under the good-faith exception to the exclusionary rule.

In *United States v. Leon*, 468 U.S. 897, 918 (1984), the Supreme Court held that the "suppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." When an officer acts in objective good faith in obtaining a search warrant from a detached, neutral magistrate, and then acts within the scope of that warrant, no police illegality occurs that the exclusionary rule would deter. *Leon*, 468 U.S. at 920–21. Thus, evidence seized through such means shouldn't be suppressed. *Id.* at 921; *accord United States v. Nolan*, 199 F.3d 1180, 1184 (10th Cir. 1999).

But our deference to warrants isn't "boundless." *Leon*, 468 U.S. at 914. In *Leon*, 468 U.S. at 923–24, the Supreme Court described four exceptional instances when an officer can't rely on a warrant in good faith. Two of those are at issue here.

## A. The "Bare Bones" Exception to the Exclusionary Rule

First, Ingram contends that the search-warrant affidavit was completely devoid of probable cause because it lacked any information suggesting that illegal activity (specifically, "drug trafficking or drug storage") was afoot at 11009 North Miller. Appellant's Opening Br. at 20. So, he contends, the police shouldn't have been able to rely on the search warrant in good faith.

11

An officer doesn't manifest objective good faith in relying on a search warrant based on an affidavit "so lacking in indicia of probable cause"—so "bare bones"—as to render official belief in the existence of probable cause "entirely unreasonable." *Leon*, 468 U.S. at 915, 923 (quoting *Brown v. Illinois*, 422 U.S. 590, 610–11 (1975) (Powell, J., concurring in part)). The question isn't the legal sufficiency of the affidavit—the issuing court has already made that determination, and we owe it deference. *United States v. Cardall*, 773 F.2d 1128, 1133 (10th Cir. 1985). The question is "whether a 'reasonably well trained officer would have known that the search was illegal despite the [court's] authorization.'" *Gonzales*, 399 F.3d at 1230 (quoting *Leon*, 468 U.S. at 922 n.23). In this context, that means asking whether officers' reliance on the underlying documents was "wholly unwarranted." *Cardall*, 773 F.2d at 1133. Only then is good faith absent. *Id.*; *Gonzales*, 399 F.3d at 1230.

In practice, we've used this standard to suppress evidence seized with a warrant that contained "nothing more than a hunch." *See, e.g.*, *United States v. Cordova*, 792 F.3d 1220, 1226 (10th Cir. 2015) ("Boiled down, the affidavit at issue here indicated nothing more than that a high-volume drug delivery was set to be made to a vehicle parked in front of Cordova's former home nearly two years before officers sought a warrant for his current home and that one party to that drug deal was present at Cordova's current residence on one occasion four months before the warrant was executed."); *Gonzales*, 399 F.3d at 1230–31 (concluding that an affidavit whose only attempt at connecting the suspect to the criminal activity was a detective's assertion that "in his experience, 'firearm [sic] are often kept at the

12

residence,'" didn't set forth even a minimal nexus to criminal activity (alteration in original)).

Here, Detective McRorie's affidavit may have provided only a tenuous nexus between the Rollin' 90's gang's criminal activity and 11009 North Miller, but it amounted to more than a hunch. As we have often stated, it's "merely common sense that a drug supplier will keep evidence of his crimes at his home." *United States v. Sanchez*, 555 F.3d 910, 914 (10th Cir. 2009); *see also, e.g.*, *United States v. Windrix*, 405 F.3d 1146, 1153 (10th Cir. 2005); *United States v. Sparks*, 291 F.3d 683, 689–90 (10th Cir. 2002); *accord* 2 Wayne R. LaFave & David C. Baum, *Search & Seizure* § 3.7(d) (5th ed., Oct. 2017 update) ("[I]t is commonly held that this gap [between probable cause that a person has committed a crime on the street and probable cause that evidence of the crime exists at his house] can be filled merely on the basis of the affiant-officer's experience (or, for that matter, the magistrate's own common-sense judgment) that drug dealers ordinarily keep their supply, records and monetary profits at home."). And Detective McRorie's affidavit provided ample evidence that Ingram dealt drugs, including the three informants' statements, the police's surveillance of Ingram, and Ingram's history of drug activity and arrests. When combined with the assertion, based on the detective's training and experience, that a high-level drug trafficker like Ingram probably kept incriminating records at his primary residence, this evidence warranted good-faith reliance from the officers who executed the search.

In reaching this conclusion, we note that this case differs from cases like *Sanchez*, *Windrix*, and *Sparks* insofar as the affidavits in those cases asserted the presence of illegal drugs at the suspected dealer's house, while the affidavit here did not. *See Sanchez*, 555 F.3d at 913, *Windrix*, 405 F.3d at 1153, *Sparks*, 291 F.3d at 690–91. Even Professor LaFave's gap-filling shortcut, which recognizes that experience and common sense can sometimes substitute for "definite proof," presumes either (1) that "the seller keeps his supply at his residence" or (2) that "the on-the-street dealer has his necessary packaging and weighing equipment at home." *See* LaFave, *supra*, § 3.7(d). But according to Detective McRorie, Ingram was no on-the-street dealer; he was a high level drug trafficker. Detective McRorie thus expressed doubt that Ingram kept illegal drugs at his primary residence. And the pieces of evidence that the detective sought to find there—ledgers, cash, evidence of gang-membership—were not themselves contraband. Instead, police sought the listed items as evidence of Ingram's criminal activity, ledgers reflecting drug debts, cash from drug sales, and gang-affiliation evidence tied to the drug-trafficking conspiracy and Ingram's role in it.

But while we do not announce a broad rule making a suspected drug dealer's house fair game for searches absent evidence of contraband there, we can't say that the affidavit *in this case* was so devoid of factual support as to render police reliance on the state-court judge's determination of probable cause objectively unreasonable. *Cf. Nolan*, 199 F.3d at 1185 (concluding that an affidavit establishing (1) that the defendant dealt crack, (2) that he "was careful not to sell drugs to anyone from his

14

residence," and (3) "that drug dealers sometimes maintain records and quantities of drugs in easily accessible locations" wasn't so bare bones as to make officers' reliance on the search warrant unreasonable).

Accordingly, we reject Ingram's contention that the affidavit was so bare bones as to subject the evidence seized at 11009 North Miller to the exclusionary rule. And we turn from Ingram's sufficiency attack to his truthfulness attack.[3]

## B. The *Franks v. Delaware* Exception to the Exclusionary Rule

Ingram claims that Detective McRorie deliberately lied (or acted with reckless disregard for the truth) when he omitted Ingram's and his alleged co-conspirators' incarceration from the search-warrant affidavit. These omissions, according to Ingram, were material to the Oklahoma District Court's probable-cause finding. He says that if the detective had stated that Ingram and his co-conspirators were in state custody from 2005 until 2013, then the judge wouldn't have believed that "Ingram had been involved in a continuous drug-trafficking conspiracy for the last [sixteen] years [i.e., since 1998]." Appellant's Opening Br. at 56.

---

[3] Ingram also challenges Detective McRorie's reliance on the statements of the three confidential informants, but he does so only in the context of arguing that the affidavit lacked probable cause. Because we resolve this appeal on the basis of the exclusionary rule's good-faith exception, we don't delve into the existence of probable cause and, therefore, need not address the informants' veracity. Even so, the same concerns that throw probable cause into doubt may do the same to good faith. Accordingly, we note that the district court found the informants' statements reliable, both because the informants corroborated each other and because other evidence (including surveillance) supported their assertions. *Cf. United States v. Mathis*, 357 F.3d 1200, 1204 (10th Cir. 2004) (concluding that an officer's obligation to corroborate information received from an informant requires only that the officer "have knowledge of other matters that reasonably corroborate the informant's statements"). The district court's findings in this context weren't clearly erroneous.

Suppression remains an available remedy if the affiant misled the judge issuing the warrant with information "that the affiant knew was false or would have known was false except for his reckless disregard of the truth." *Leon*, 468 U.S. at 923 (citing *Franks v. Delaware*, 438 U.S. 154 (1978)). But *Franks* announced a tough-to-meet test for affiants' alleged lies. First, *Franks* cloaks affidavits in "a presumption of validity." *Franks*, 438 U.S. at 171. Establishing a lack of good faith based on the omission of information from an affidavit requires proof that the affiant acted intentionally or recklessly, not with mere negligence or by an innocent mistake. *Gonzales*, 399 F.3d at 1229. Second, *Franks* doesn't extend to "immaterial omissions." *Stewart v. Donges*, 915 F.2d 572, 583 (10th Cir. 1990). If "a warrant would have issued in a but-for world where the attesting officer faithfully represented the facts," then we can dismiss the contested omission as immaterial. *United States v. Herrera*, 782 F.3d 571, 575 (10th Cir. 2015).

Here, Ingram can't overcome even the first hurdle, the presumption of validity. Rather than hide Ingram's eight-year incarceration, Detective McRorie's affidavit suggested that Ingram had served time. According to the affidavit, police had arrested Ingram on drug charges four times between 1998 and 2005 (just over nine years before the warrant's execution). Though the affidavit didn't provide charging or sentencing information about these incidents, the amounts of drugs and guns seized augured prison time. Further, the affidavit expressly described the gang's ability to "thrive" despite the incarceration of its members, by contributing money to incarcerated members' inmate trust accounts and bonding members out of jail. At

16

worst, Detective McRorie might have acted negligently by not specifying the dates of Ingram's incarceration. At best, the affidavit read as a whole shows the conclusory nature of Ingram's assertion. Either way, Ingram can't show the kind of deliberate or reckless falsity that would entitle him to relief under *Franks*.[4]

But even if Detective McRorie had acted with deliberate or reckless disregard for the truth in omitting Ingram's and his alleged co-conspirators' periods of incarceration, the omission wasn't material. Nothing in the affidavit suggests that Ingram was on the streets when in fact he was in prison or that he was in prison when in fact he was on the streets. Instead, the bulk of the drug-trafficking described in the affidavit happened in 2014, when Ingram was, by his own admission, out of prison. Thus, even if Detective McRorie had included Ingram's and his co-conspirators' incarceration periods in the affidavit, it wouldn't have undermined the Oklahoma County District Court's probable-cause finding. *Herrera*, 782 F.3d at 575; *cf. Stewart*, 915 F.2d at 581–83 (concluding that a detective's failure to disclose that the victim had recanted his accusation and admitted to an insurance scam was "highly material" because "the affidavit would not support probable cause if it were modified so as to include that exculpatory evidence").

_____

[4] On appeal, Ingram argues both that the district court erred in refusing to grant him a hearing on his *Franks* claim and, more generally, that under *Franks*, law enforcement couldn't rely on the search warrant in good faith. Our analysis doesn't differentiate between the preliminary showing needed to get a *Franks* hearing and the preponderance-of-the-evidence showing needed to obtain suppression because, under either standard, Ingram isn't entitled to relief. *See United States v. Corral-Corral*, 899 F.2d 927, 933 (10th Cir. 1990) (describing the standard at each stage); *see also Herrera*, 782 F.3d at 576 ("A *Franks* hearing sometimes may be a matter of grace rather than right.").

Accordingly, we conclude that the state-court judge's probable-cause determination wasn't based on a deliberate or reckless omission by Detective McRorie, so we decline to apply *Franks* to defeat the *Leon* good-faith exception. Instead, we affirm the district court's refusal to grant Ingram a *Franks* hearing.

*     *     *

Applying *Leon*'s generous standard, the police in this case acted in good faith in executing the search warrant on 11009 North Miller. And because no exception to the good-faith exception applies, we conclude that this is not one of "those unusual cases in which exclusion will further the purposes of the exclusionary rule" and decline to suppress the evidence seized during the search. *See Leon*, 468 U.S. at 918.

**CONCLUSION**

For these reasons, we affirm the district court's refusal either to suppress the evidence seized from 11009 North Miller or to hold a *Franks v. Delaware* hearing.

Entered for the Court


Gregory A. Phillips
Circuit Judge