**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 20, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff-Appellant,

v.

MICHAEL L. BIGLOW,

    Defendant-Appellee.

No. 08-3155

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. No. 6:07-CR-10221-MLB-3)**

---

Richard A. Friedman, Appellate Section, Criminal Division, United States Department of Justice (Eric F. Melgren, United States Attorney, Kansas City, Kansas, James A. Brown, Assistant United States Attorney, Topeka, Kansas, and Debra L. Barnett, Assistant United States Attorney, Wichita, Kansas, with him on the briefs), Washington, D.C., for Plaintiff-Appellant.

John Jenab, Jenab & McCauley, LLP, Olathe, Kansas, for Defendant-Appellee.

---

Before **LUCERO**, **BALDOCK**, and **MURPHY**, Circuit Judges.

---

**BALDOCK**, Circuit Judge.

---

Defendant Michael L. Biglow's contacts with a major drug dealer, Tyrone Andrews, led the Government to suspect Defendant was also engaged in drug trafficking. Based on the Government's affidavit, which described investigators' surveillance activities and information gleaned from confidential informants, a

United States Magistrate Judge issued a warrant to search Defendant's home for evidence related to his alleged drug dealing activities. Authorities' search of Defendant's residence located $769.11 in United States currency, a scale, packaging material, firearms, ammunition, drugs, and drug paraphernalia.

Subsequently, a grand jury charged Defendant with (1) possessing cocaine, in violation of 21 U.S.C. § 841(a)(1); (2) possessing cocaine with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1); (3) conspiring to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) & 846; (4) using a communication facility to facilitate a felony, in violation of 21 U.S.C. § 843(b); and (5) unlawfully possessing two firearms, in violation of 18 U.S.C. § 922(g)(1). Defendant moved to suppress the evidence found in his home, arguing that authorities lacked probable cause to search his residence. In response, the Government defended the magistrate judge's probable-cause determination and, in the alternative, suggested the good-faith exception established in United States v. Leon, 468 U.S. 897 (1984) should apply.

The district court considered the matter and concluded the Government's affidavit failed to establish the probable cause necessary to search Defendant's home. Because it viewed the Government's evidence as utterly failing to establish (1) that Defendant was engaged in selling drugs to others and (2) the required nexus between Defendant's drug-related activities and his residence, the district court also ruled that the good-faith exception did not apply. Consequently, the district court suppressed the evidence found in Defendant's home. See United States v. Cunningham, 413

2

F.3d 1199, 1203 (10th Cir. 2005) (recognizing the exclusionary rule mandates the suppression of evidence obtained as the result of an illegal search). The Government maintains, on appeal, that the magistrate judge's probable-cause determination should stand. In the alternative, it argues that the good-faith exception forestalls the exclusionary rule's application in this case. We have jurisdiction under 18 U.S.C. § 3731, and reverse.

## I.

Probable cause must support the warrant authorizing the Government's search of Defendant's residence. See U.S. Const. amend. IV. (stating "no warrants shall issue, but upon probable cause"). Indeed, the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." United States v. U.S. Dist. Court, 407 U.S. 297, 313 (1972). Our analysis of the lawfulness of this search begins with a summary of the evidence presented in the Government's probable-cause affidavit and the terms of the search warrant issued by the magistrate judge. We then proceed to outline why the district court found the Government's affidavit lacked the indicia of probable cause necessary to justify a search under the Fourth Amendment.

## A.

Special Agent Greg Heiert of the United States Bureau of Alcohol, Tobacco, Firearms and Explosives executed the Government's affidavit. The affidavit describes a series of revelations by confidential informants related to a major

3

supplier of cocaine in Wichita, Kansas known as "Roni." These confidential sources revealed that "Roni" (1) supplied local gang members with large amounts of cocaine, (2) usually sold cocaine in amounts ranging from a half to a whole kilogram, (3) was considered a "big fish" who purchased cocaine imported from Mexico, (4) regularly obtained around ten kilograms of cocaine a week, and (5) owned a stash house near the intersection of Mt. Vernon and Oliver. Through additional personal information provided by informants and one photo identification, authorities learned that "Roni's" true name was Tyrone Andrews.[1]

Tyrone Andrews worked at an aerosystems company. Real estate records revealed that he owned six properties in the Wichita area. One of these properties, a home on South Ridgewood (Ridgewood), was located only a half mile east of the intersection of Mt. Vernon and Oliver. Based on the tip they had received regarding the location of Andrews' stash house, authorities began periodic surveillance of the Ridgewood residence in May 2007. Investigators observed Andrews entering the house either after work or on the weekends. He never stayed for long and subsequently made stops at various residences in the Wichita area.

In late June 2007, officials arranged for a confidential source to make two controlled drug buys from Andrews. Detectives contacted Andrews by telephone and

---

[1] For instance, a confidential source described "Roni" as driving a two-door, newer, white Honda. Andrews regularly drove a two-door, 2003, white Honda Accord.

asked him to supply the informant with cocaine. Subsequently, Andrews stopped at the Ridgewood house for a few minutes, drove to the confidential informant's location, and sold him cocaine. Authorities arranged a similar drug buy four days later, while Andrews was at his Ridgewood residence. After the purchase was arranged, Andrews again drove to the confidential source's location and sold him cocaine.

Authorities witnessed Defendant Biglow's first interaction with Andrews approximately two weeks later. Shortly after Andrews appeared at his Ridgewood address, Defendant arrived at the house in a silver Volvo. He entered the residence carrying a black briefcase, remained inside for approximately half an hour, and then left carrying the briefcase. Trailing investigators orchestrated a stop of Defendant's vehicle, for an observed traffic violation, near the intersection of Kellogg and Rock Road. The detaining officer observed the black briefcase on the front passenger seat of the vehicle, issued Defendant a traffic citation, and sent him on his way. Approximately seventeen days later, a confidential source reported that Andrews was concerned authorities were monitoring his activities because a customer to whom he had sold two kilograms of cocaine had recently been followed by police and stopped in the area of Kellogg and Rock Road.

Based on the evidence gleaned from their ongoing investigation, officials received authorization to wiretap two phone numbers belonging to Andrews. Monitoring of these lines began on September 6, 2007. At the same time,

5

investigators stepped up their surveillance of Andrews. They discovered that Andrews normally left work around 2:30 pm, arriving at the Ridgewood property by 3:00 pm. Thereafter, he would receive phone calls from individuals ordering varying amounts of drugs. Andrews would then go on "runs" to deliver these orders to his customers' homes.

Over a twelve-day period beginning on September 10th and ending on September 21st, the Government's wiretaps revealed a series of seven phone calls between Andrews and a male caller using a phone number belonging to Defendant. During the first call, the caller asked Andrews "how we lookin?" When Andrews inquired as to who was calling, the caller identified himself as "Big." Andrews stated that the "other people, they said today but they ain't called me" and the caller indicated he would call Andrews back. The next day, the caller asked if he could meet Andrews either that day or the next. Andrews said it would be tomorrow and the caller indicated he would call after Andrews returned from work.

This third call took place as planned. Andrews stated that he would need to talk to his people before the two met, indicated that "Fat Boy" had called, and explained that he needed to contact him. After he spoke with "Fat Boy," Andrews suggested he might have to "go mess with [his] regular people." Investigators learned that "Fat Boy" is a Hispanic male named Jose Pizana, who supplied Andrews with several kilograms of cocaine. The next day the caller again rang Andrews and asked if his "boy [had] come through." Andrews responded in the affirmative and

6

the caller asked, "How many points is that?," to which Andrews replied "one-nine." The caller asked Andrews to repeat himself. Once Andrews had done so, the caller responded "okay, uh-two" and arranged to call Andrews back.

The next morning Andrews contacted the caller. The caller indicated he was about to go to work but he would "take it with" him. To this Andrews responded, "Alright, just call me." Approximately an hour later, the caller contacted Andrews, stated that he was at work, and asked if anything was about to come through. Andrews indicated that it would be in the next thirty to forty minutes. Surveillance units proceeded to follow Andrews to a parking lot outside the shopping center where Defendant Biglow worked as a security guard. Investigators witnessed Defendant meet with Andrews, but their view of this rendezvous was partially obstructed by another vehicle.

One week later, the caller again contacted Andrews and asked, "How we lookin' man?" Andrews replied that he had not heard from "Fat Boy," which prompted the caller to question whether Andrews had heard from "the high boy." Andrews explained that "the high boy" "only had them other ones left and I got them last night." The caller asked Andrews what he was "lettin' it go for?" Andrews explained to him that he could not have "it" because "it" was already sold. Subsequently, the caller expressed frustration that Fat Boy had not called Andrews back and inquired whether Andrews' "high people [were] coming any time soon." Andrews stated that it would be a week. Over a period of several months, authorities

7

observed a Hispanic male carrying a brown bag into the Ridgewood house, whom they believed to be Andrews' "high dollar" source.

One day after the final monitored call between Andrews and the male caller, investigators witnessed Andrews leaving his Ridgewood residence with a black bag in his car. Police stopped Andrews car, but when the officers attempted to get Andrews to exit the vehicle he sped away. While in pursuit, officers witnessed Andrews throw a black bag out his car window. They stopped to recover the bag and found a large quantity of cocaine. Authorities later took Andrews into custody.

Based on the forgoing evidence, a United States Magistrate Judge found probable cause existed to search Defendant Biglow's residence for (1) records related to drug distribution, (2) financial records and receipts, (3) U.S. currency and financial instruments, (4) address and telephone books, (5) communications devices, recordings, and bills, and (6) photographs. In authorizing a search for these items, the magistrate judge credited Special Agent Heiert's observation, in his affidavit, that in his training and experience people frequently maintain financial records and work-related documents at home, and that those involved in the sale and use of illegal substances commonly possess U.S. currency and customer contact information in their place of residence.

Authorities uncovered cocaine residue in a clear plastic bag and a firearm in Defendant's home. The Government subsequently obtained a second warrant to search Defendant's residence for drugs and drug paraphernalia. As the propriety of

the second search warrant depends entirely on that of the first, we address only the original warrant in this appeal.

B.

In granting Defendant's motion to suppress, the district court identified two main deficiencies in the Government's probable-cause affidavit. First, the district court noted that our precedents require a nexus between suspected criminal activity and the place to be searched. See United States v. Corral-Corral, 899 F.2d 927, 937 (10th Cir. 1990). Because the Government's affidavit did "not establish that drug activity was observed at the home being searched," the district court determined that this nexus requirement had not been met. United States v. Biglow, No. 07-10221, at 6 (D. Kan. June 6, 2008) (Suppression Order). Indeed, pointing to the ambiguity of the terms used in the wiretap transcripts, the district court viewed it as uncertain that Andrews and Defendant were even arranging the sale of illegal drugs. See id.

Second, the district court recognized that an affiant officer's statement that drug dealers often keep records in their homes, in conjunction with evidence that an individual is a drug dealer, may establish probable cause to search that person's home. See United States v. One Hundred Forty-Nine Thousand Four Hundred Forty-Two and 43/100 Dollars ($149,422.43) in U.S. Currency, 965 F.2d 868, 874 (10th Cir. 1992). But it concluded the Government's affidavit provided no evidence that Defendant supplied drugs to others. See Suppression Order at 7-8. Thus, the district court opined that "no evidence" supported "the conclusion that records of

9

drug sales and/or co-conspirators would be found at" Defendant's residence. Id.;
see also id. ("[I]t would be a stretch to presume that defendant would have records
of drug transactions in his home, a location that was never visited by anyone").

The district court also rejected the Government's argument that the good-faith
exception should apply. Based on its conclusion that the Government's affidavit
failed to establish a nexus between Defendant's alleged criminal activities and his
residence, the court ruled that the Government's evidence was "so lacking in indicia
of probable cause as to render official belief in its existence entirely unreasonable."
Leon, 468 U.S. at 923. A reasonable "officer would know that the [Tenth] Circuit
requires that nexus to exist." Suppression Order at 9. Thus, the district court
concluded that a "complete lack of any nexus cannot be saved by the Leon good-faith
exception." Id.

## II.

Before we consider the sufficiency of the Government's affidavit, we must
address a potential conflict in our precedents regarding the Fourth's Amendment's
nexus requirement. All agree that a nexus must exist between suspected criminal
activity and the place to be searched, but the parties dispute the strength of the
evidence that must link the two.[2] On one hand, Defendant cites our decision in

---

[2] We identified this potential conflict in United States v. Nolan, 199 F.3d
1180, 1183-84 (10th Cir. 1999), but declined to resolve it. See 199 F.3d at 1184.
Instead, we exercised "our discretion to decide [that] case under the good-faith
exception to the exclusionary rule" and left "for another day the probable cause
(continued...)

Rowland v. United States, 145 F.3d 1194, 1204 (10th Cir. 1998) for the proposition that probable cause "to search a person's residence does not arise based solely upon probable cause that the person is guilty of a crime." We noted, in that case, that "additional evidence" must link a defendant's home to "the suspected criminal activity." 145 F.3d at 1204. On the other hand, the Government relies on a line of cases associated with United States v. Reyes, 798 F.2d 380, 382 (10th Cir. 1986), which suggest that evidence indicating a defendant is a drug trafficker is alone sufficient to establish probable cause to search that defendant's residence for drugs and related evidence. See United States v. Sanchez, 555 F.3d 910, 912, 914 (10th Cir. 2009) (indicating that once probable cause exists that a person is a supplier of illegal drugs, probable cause also exists to search that person's home for contraband and other evidence).

We recognize that our cases in this area are open to conflicting interpretations, but we believe the application of basic Fourth Amendment principles avoids such internal strife. The "touchstone" of the Fourth Amendment is "reasonableness." Samson v. California, 547 U.S. 843, 855 n.4 (2006). Whether a sufficient nexus has been established between a defendant's suspected criminal activity and his residence thus necessarily depends upon the facts of each case. See Maryland v. Pringle, 540 U.S. 366, 371 (2003) (noting that probable cause "deals with probabilities and

---

[2](...continued)
inquiry." Id.; see also United States v. Sanchez, 555 F.3d 910, 914 (10th Cir. 2009).

11

depends on the totality of the circumstances"). Certain non-exhaustive factors relevant to our nexus analysis include (1) the type of crime at issue, (2) the extent of a suspect's opportunity for concealment, (3) the nature of the evidence sought, and (4) all reasonable inferences as to where a criminal would likely keep such evidence. See Anthony v. United States, 667 F.2d 870, 874 (10th Cir. 1981); United States v. Rahn, 511 F.2d 290, 293 (10th Cir. 1975).

While the nexus requirement — like probable cause itself — is not reducible "to a neat set of legal rules," see Pringle, 540 U.S. at 371, our case law reveals that little "additional evidence" is generally required to satisfy the Fourth Amendment's strictures. We have never required, for example, that hard evidence or "personal knowledge of illegal activity" link a Defendant's suspected unlawful activity to his home. $149,422.43, 965 F.2d at 874; see also United States v. Tisdale, 248 F.3d 964, 971 (10th Cir. 2001) (explaining that probable cause to "believe certain items will be found in a specific location is a practical, nontechnical conception . . . that need not be based on direct, first-hand, or 'hard' evidence") (quoting United States v. Thomas, 757 F.2d 1359, 1367 (2d Cir. 1985)). Instead, we have indicated that a sufficient nexus is established once "an affidavit describes circumstances which would warrant a person of reasonable caution" in the belief that "the articles sought" are at a particular place. $149,422.43, 965 F.2d at 874; see also Rahn, 511 F.2d at 293.

We have long recognized that magistrate judges may "rely on the opinion" of

12

law enforcement officers "as to where contraband" or other evidence "may be kept." United States v. Hargus, 128 F.3d 1358, 1362 (10th Cir. 1997). In some cases, the "additional evidence" linking an individual's suspected illegal activity to his home has thus come in the form of an affiant officer's statement that certain evidence — in his or her professional experience — is likely to be found in a defendant's residence. See, e.g., Sanchez, 555 F.3d at 913 (pointing to an affiant officer's observation that, in his professional experience, drug dealers often keep evidence related to their unlawful activities at home); United States v. Sparks, 291 F.3d 683, 685 (10th Cir. 2002) (same); $149,442.43, 965 F.2d at 874 (same). But an affiant officer need not draw an explicit connection between a suspect's activities and his residence for a Fourth Amendment nexus to exist.

"Additional evidence" connecting a defendant's suspected activity to his residence may also take the form of inferences a magistrate judge reasonably draws from the Government's evidence. See, e.g., Tisdale, 248 F.3d at 971 (concluding a magistrate judge could infer a nexus existed to search a suspect's car where a dead body lay adjacent to the vehicle and an unidentified party had opened the trunk earlier in the day); Hargus, 128 F.3d at 1362 (inferring a nexus to a suspect's residence based on the small scale of his business, the ongoing nature of the conspiracy at issue, and the fact that he used his home telephone to arrange the sale of stolen goods); Reyes, 798 F.2d at 382 (approving the inference that evidence would be found at a defendant's home based on an affiant officer's statement that the

13

conspirators maintained records of their activities); Anthony, 667 F.2d at 874 (reasoning that since an illegal wiretap device had to be constructed it was reasonable to assume evidence related to its assemblage would be found at a suspect's home); Rahn, 511 F.2d 293-94 (explaining that it was reasonable to assume an ATF agent who allegedly possessed a stolen gun and used it to go hunting would keep the weapon at his home).

In other words, magistrate judges may draw their own reasonable conclusions, based on the Government's affidavit and the "practical considerations of everyday life," as to the likelihood that certain evidence will be found at a particular place. Anthony, 667 F.2d at 874. Thus, we have specifically acknowledged that "the nexus between the place to be searched and the evidence sought may be established through normal inferences about the location of evidence." Tisdale, 248 F.3d at 971 (quoting United States v. Gant, 759 F.2d 484, 488 (5th Cir. 1985)); see also Reyes, 798 F.2d at 382 (noting that it "is reasonable to assume that certain types of evidence would be kept at a defendant's residence"); Anthony, 667 F.2d at 874 (same). Allowing such inferences to establish a Fourth Amendment nexus is appropriate because probable cause is a matter of "probabilities and common sense conclusions, not certainties." United States v Orr, 864 F.2d 1505, 1508 (10th Cir. 1988); see also Anthony, 667 F.2d at 874 (recognizing the Government's affidavit need not establish to a "certainty that the objects sought will be found as a result of the search").

One of these two types of "additional evidence" exists in all of the cases the

14

parties have raised in this appeal. We thus conclude that our nexus precedents do not inexorably conflict. Accordingly, we will apply the above-stated principles to the facts of this case.

### III.

We now turn to the sufficiency of the Government's affidavit. See United States v. Gonzales, 399 F.3d 1225, 1228 (10th Cir. 2005) (acknowledging that we have "discretion to address probable cause or to proceed directly to good faith"). While we review a district court's probable-cause determination de novo, see Ornelas v. United States, 517 U.S. 690, 699 (1996), our review of a magistrate judge's probable-cause ruling is more deferential. See Massachusetts v. Upton, 466 U.S. 727, 728, 732-33 (1984). The magistrate judge must consider, under the totality of the circumstances, whether probable cause — defined as a "fair probability" that contraband or other evidence will be found in a particular place — exists to conduct a search. Illinois v. Gates, 462 U.S. 213, 238 (1983).

Once a magistrate judge determines probable cause exists, the role of a reviewing court is merely to ensure the Government's affidavit provided a "substantial basis" for reaching that conclusion. Id. at 238-39. "[A]fter-the-fact, de novo scrutiny" of a magistrate's probable-cause determination is forbidden. Upton, 466 U.S. at 733. Provided the magistrate judge's "neutral and detached function" has been properly fulfilled, we accord a magistrate judge's probable-cause finding "great deference." Gates, 462 U.S. at 236, 240; see also United States v. Ventresca,

15

380 U.S. 102, 109 (1965) (noting that magistrate judges may "not serve merely as a rubber stamp for the police").

A.

One of the Supreme Court's "central teaching[s]" on the Fourth Amendment is that probable cause is a "practical, nontechnical conception," designed to operate in conjunction with the "commonsense," "practical considerations of everyday life," rather than the elaborate rules employed by "legal technicians." Gates, 462 U.S. at 230-31; see also Shadwick v. City of Tampa, 407 U.S. 345, 348-49 (1972) (explaining that warrants were traditionally issued by non-lawyers). Although we jealously guard "[f]inely-tuned" standards such as proof beyond a reasonable doubt in the context of criminal trials, standards associated with "ordinary judicial proceedings" do not inform a magistrate's decision to issue a warrant. Gates, 462 U.S. at 235. Probable cause "requires only a probability or substantial chance of criminal activity," rather than "an actual showing of such activity." New York v. P.J. Video, Inc., 475 U.S. 868, 877-78 (1986). Under this standard, innocent conduct will inevitably support some showings of probable cause. See Gates, 462 U.S. at 243 n.13; see also Upton, 466 U.S. at 734 (recognizing that "probable cause does not demand the certainty we associate with formal trials").

A finding of probable cause rests not on whether particular conduct is "innocent" or "guilty," but on the "degree of suspicion that attaches" to the Government's evidence. Illinois v. Wardlow, 528 U.S. 119, 128 (2000). Measuring

16

the degree of suspicion that attaches to a set of facts requires us to view the Government's evidence through the lens of those "versed in the field of law enforcement." Texas v. Brown, 460 U.S. 730, 742 (1983). For in this arena, the Supreme Court has precluded us from adopting the "library analysis" employed by Fourth Amendment "scholars." Id.; Ventresca, 380 U.S. at 108 (acknowledging that courts must test and interpret "affidavits for search warrants" in a "commonsense and realistic fashion").

We recognize that magistrate judges are vested with substantial discretion to draw all "reasonable inferences" from the Government's evidence. Gates, 462 U.S. at 240. Indeed, the Supreme Court has cautioned reviewing courts against adopting a "grudging or negative" attitude towards warrants, regardless of whether the magistrate judge's probable-cause determination rests on such inferences. Upton, 466 U.S. at 733. Because probable cause is a "flexible, common-sense standard," we must interpret the Government's affidavit in a flexible, common-sense way. Gates, 462 U.S. at 239. Resorting to "hypertechnical" constructions of the Government's evidence to invalidate a warrant is expressly disallowed. Id. at 236; see also Ventresca, 380 U.S. at 108 (noting that "the Fourth Amendment's commands, like all constitutional requirements, are practical and not abstract").

The Fourth Amendment's strong preference for warrants compels us to resolve "doubtful or marginal cases" by deferring to a magistrate judge's determination of probable cause. Upton, 466 U.S. at 734. For reviewing courts will accept less

17

"judicially competent or persuasive" evidence of probable cause when the Government conducts its search pursuant to a warrant. Aguilar v. Texas, 378 U.S. 108, 111 (1964), overruled on other grounds by Gates, 462 U.S. at 238. Indeed, a contrary stance would furnish police with the perverse incentive to forgo the warrant process in the hope that an "exception to the warrant clause" would materialize "at the time of the search." Gates, 462 U.S. at 236.

B.

While the evidence in the Government's affidavit could have been more compelling, we conclude it provided a "substantial basis" for the magistrate judge's determination of probable cause. Ample evidence in the Government's affidavit supports the conclusion that Andrews was a leading distributor of drugs in the Wichita area. Confidential sources, whose reliability was substantially confirmed by the Government's independent investigation, indicated that Andrews received large shipments of drugs from Mexico, owned a stash house, provided drugs to gangs, and generally dealt in quantities of cocaine ranging from a half to a whole kilogram. Based on the nature and scope of Andrews' operation, the magistrate judge could reasonably infer that he served as a major artery through which drugs were pumped to lower-level drug traffickers, who operated on a vein-like scale.

The magistrate judge also had adequate grounds to find a substantial likelihood that Andrews sold Defendant distribution-level quantities of drugs. Andrews' statement that a customer who had purchased two kilograms of cocaine was stopped

18

at the intersection of Kellogg and Rock Road; not long after Defendant (1) left Andrews' stash house carrying a briefcase, and (2) was stopped at that location; strongly suggested that this purchase was made by Defendant. Those versed in the field of law enforcement are certainly aware that two kilograms of cocaine is a significant quantity of drugs. See United States v. Edwards, 69 F.3d 419, 427, 431 (10th Cir. 1995) (characterizing the fronting of two kilograms of cocaine as the distribution of a "large quantit[y] of drugs"); United States v. Soto, 375 F.3d 1219, 1220 (10th Cir. 2004) (recounting a DEA agent's trial testimony that the sale of two kilograms of cocaine was a "fairly large drug transaction[]"). Our precedents establish that an inference of the intent to distribute is justified when an individual possesses a large quantity of drugs. See, e.g., Sparks, 291 F.3d at 689; United States v. Delrea-Ordones, 213 F.3d 1263, 1268 n.4 (10th Cir. 2000). In fact, we have specifically noted that the possession of more than five-hundred grams of cocaine is "consistent with possession with intent to distribute, and is inconsistent with simple possession." United States v. Gama-Bastidas, 222 F.3d 779, 787 (10th Cir. 2000).

Based on the Government's affidavit, the magistrate judge could also reasonably conclude that Defendant purchased, or attempted to purchase, additional amounts of cocaine from Andrews. Defendant repeatedly contacted Andrews to arrange the purchase of illegal drugs.[3] Indeed, a common-sense interpretation of

---

[3] Viewing the Government's evidence in the light most favorable to the district court ruling, as we are required to do, we cannot escape the conclusion that
(continued...)

these exchanges suggests Defendant purchased an additional two kilograms of cocaine when he met with Andrews in a parking lot near his work.  See Spinelli v. United States, 393 U.S. 410, 419 (1969), overruled on other grounds by Gates, 462 U.S. at 238 (noting that, "in judging probable cause," magistrates are "not to be confined" by miserly "limitations or by restrictions on the use of their common sense").  Barely one week later, Defendant contacted Andrews about another drug buy.  The magistrate judge could, therefore, reasonably consider Defendant's drug purchases to be not only substantial, but also relatively frequent.  Both of these factors significantly bolster the probability that Defendant was engaged in the drug trade.

Considering all of the circumstances, a substantial basis in the evidence supports the magistrate judge's determination that Defendant was engaged in the sale of illegal drugs.  In addition, Special Agent Heiert noted, in his affidavit, that drug dealers often keep evidence related to their illegal activities at their homes.  This observation provided the "additional evidence" necessary to establish a nexus

[3](...continued)
the district court clearly erred in suggesting Defendant's phone conversations with Andrews did not concern the purchase of illegal drugs.  See Sparks, 291 F.3d at 687.  The district court also erred in holding the Government's evidence to a trial-like standard of proof.  See Suppression Order at 6 ("[T]he affidavit lacks any evidence that the numbers discussed signify drug quantities.  Also, there is no direct information from the confidential informant or a surveilling officer that an actual drug transaction occurred.").  As we have explained, probable cause requires "a probability or substantial chance of criminal activity, not an actual showing of such activity."  P.J. Video, Inc., 475 U.S. at 877-78.

20

between Defendant's suspected drug trafficking activities and his residence.  See supra Part II; see also Sanchez, 555 F.3d at 914 ("[W]e think it merely common sense that a drug supplier will keep evidence of his crimes at his home.").  The warrant issued by the magistrate judge thus satisfies the requirements of the Fourth Amendment.[4]

REVERSED.

---

[4] As we have upheld the constitutionality of the warrant, we need not consider the applicability of the good-faith exception established in Leon.