FILED
United States Court of Appeals
Tenth Circuit

July 10, 2020

Christopher M. Wolpert
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
———————————————————

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

FREDERICK EUGENE JENKINS,

    Defendant - Appellant.

No. 19-6014
(D.C. No. 5:18-CR-00065-SLP-1)
(W.D. Okla.)

———————————————————

**ORDER AND JUDGMENT**[*]
———————————————————

Before **LUCERO**, **KELLY**, and **PHILLIPS**, Circuit Judges.
———————————————————

Though "a 'man's house is his castle,'" *Payton v. New York*, 445 U.S. 573, 596 (1980), not all castles are impenetrable. Under the Fourth Amendment, officers do not need a Trojan Horse or a trebuchet to breach a citizen's home—all they need is a warrant supported by probable cause. This case presents the question whether officers had probable cause to search Frederick Jenkins's home upon learning that the State of Oklahoma was currently prosecuting him for serious drug crimes and upon finding a small baggie with methamphetamine residue among the trash left for

---

[*] After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

disposal on the street outside his house. We hold that together these factors provided the warrant-issuing judge with a substantial basis to conclude that the officers had probable cause. Accordingly, because the search warrant was valid, and because Jenkins has waived any appellate challenge to his detention and confession, we affirm the district court's denial of Jenkins's motions to suppress.

## BACKGROUND

### I. Sergeant Harmon's Investigation

In January 2018, a confidential source[1] gave Oklahoma City police officers[2] a vague tip that Jenkins was involved in criminal activity[3] and that he lived on Wilshire Boulevard in Oklahoma City, Oklahoma.[4] Those officers told Sergeant Harmon about

---

[1] Though Sergeant Harmon's affidavit does not use this term, at a suppression hearing he described the tipster as a "confidential source" and testified that he omitted further details "to protect that confidential source[.]" R. vol. 2 at 5. We adhere to Sergeant Harmon's description and call this person the "confidential source."

[2] The government asserts that "Sgt. Aaron Harmon received" this tip. Appellee's Br. 2–3. But Sergeant Harmon testified that he "never spoke to [the confidential source]." R. vol. 2 at 15. Thus, it appears that Sergeant Harmon did not directly receive the tip; rather, he indirectly learned about the tip from other officers.

[3] The confidential source told the officers that Jenkins had been involved with a "firearms offense"—possibly a robbery or burglary at a Cabela's store. R. vol. 2 at 16. But in his probable-cause affidavit, Sergeant Harmon did not include this fact, mentioning instead that the confidential source had stated that Jenkins was "involved in various illegal activities[.]" R. vol. 1 at 25.

[4] The government contends that the "initial tip" was "that Mr. Jenkins was involved in criminal activity at the Residence." Appellee's Br. 13. But Sergeant Harmon stated in his probable-cause affidavit that the tip was this: "[A] subject name[d] Frederick Eugene Jenkins D.O.B. /88 is involved in various illegal activities and that he lives at . . . Wilshire Blvd." R. vol. 1 at 25. That does not say that Jenkins

2

the tip, and Sergeant Harmon began investigating. After consulting Oklahoma City Police Department records and Oklahoma County jail records, and after "learn[ing] that Jenkins has a 2001 Hyundai sedan with Oklahoma tag 404KJX registered to him at [the Wilshire address]," Sergeant Harmon confirmed that Jenkins resided there. R. vol. 1 at 25–26; *see also* Appellant's Principal Br. 12 (noting that "[s]urely other records available to the affiant connected Mr. Jenkins to the address").

Sergeant Harmon also searched the Oklahoma City Police Department records to see whether Jenkins had any criminal history. He did: On June 18, 2017, Oklahoma City police officers arrested Jenkins after finding him with 4.3 grams of methamphetamine, 572 Alprazolam pills, 483 ecstasy pills, 0.6 grams of marijuana, and a digital scale.[5] Jenkins had also possessed a loaded .45 caliber Taurus handgun. Sergeant Harmon further learned that "[d]uring the arrest a vehicle was also impounded."[6] R. vol. 1 at 26.

---

was involved in criminal activity *at* the residence. And Sergeant Harmon later testified that, in fact, the tip was about "a firearms offense" that may have occurred at a Cabela's store, not the residence. R. vol. 2 at 16.

[5] Sergeant Harmon did not identify Jenkins's charges. Even so, Sergeant Harmon did provide a case number: "CF2017-4096." R. vol. 1 at 26. Public records show that Jenkins faced four state-law felony charges: (1) possessing ecstasy with intent to distribute, (2) possessing alprazolam with intent to distribute, (3) possessing methamphetamine and marijuana, and (4) unlawfully carrying a firearm. Okla. State Courts Network, https://www.oscn.net/dockets/GetCaseInformation.aspx?db= oklahoma&number=CF-2017-4096 (last visited June 8, 2020). We take judicial notice of these charges. *See United States v. Ahidley*, 486 F.3d 1184, 1192 n.5 (10th Cir. 2007).

[6] In view of this ambiguous language—i.e., "a vehicle" was impounded—it is unclear whether the vehicle was Jenkins's sedan. That said, Sergeant Harmon did

In addition, Sergeant Harmon learned that "Oklahoma Department of Corrections records show a [2005] case filed against Jenkins for Trafficking in Illegal Drugs in Garfield County[.]" *Id.* Because Jenkins was then only seventeen years old, Sergeant Harmon wondered whether Jenkins had successfully petitioned to have the case expunged—records of the 2005 case appear in only the Oklahoma Department of Corrections records, not the Oklahoma State Courts Network records. Sergeant Harmon called the Oklahoma County district attorney, and one of those two men learned from the Garfield County district attorney that after Jenkins served out his sentence the 2005 conviction was later expunged.

Sergeant Harmon next planned and executed a "trash pull." By checking online, Sergeant Harmon learned that garbage-disposal workers would be picking up trash from the Wilshire residence on February 27, 2018. So that day, Sergeant Harmon and other officers went to the semi-rural residence, grabbed the two trashcans from the street outside the house, and dumped their contents into the back of his pickup truck.[7] Later sorting through the trash elsewhere, they found (1) "[a] small Ziploc bag with residue field testing positive for methamphetamine," (2) "[a] copy of an [Oklahoma City Police Department] vehicle impound sheet [the sheet being from Jenkins's arrest on 6/18/17]" and (3) "[a] Styrofoam tray from a box of rifle ammunition." *Id.*

---

note that whatever vehicle it was, the "OCPD vehicle impound sheet" was from "Jenkins' arrest on 6/18/17." R. vol. 1 at 26.

[7] A person has no reasonable expectation of privacy in discarded trash left on the curb for garbage collection. *California v. Greenwood*, 486 U.S. 35, 40–41 (1988).

4

Having gathered this evidence, Sergeant Harmon drafted a probable-cause affidavit and submitted it to an Oklahoma County District Court Special Judge, requesting a search warrant for the Wilshire residence. As support for his opinion that "there is probable cause to believe that Frederick Eugene Jenkins is involved in illegal activities at this location," *id.*, Sergeant Harmon included most of the details from his investigation, but he omitted two: (1) that the tip had referenced "a firearms offense," and (2) that Jenkins's 2005 case had been expunged.

On February 28, 2018, the district court special judge approved a search warrant for the Wilshire residence. The search warrant allowed officers to search for "Methamphetamine, Drug Paraphernalia, Digital and Manual Scales, Drug Proceeds . . . firearms, ledgers, and other types of documentation regarding the sale of narcotics and tending to establish dominion and control over the location being searched." *Id.* at 23.

## II.     The Traffic Detention and Search Warrant

On March 7, 2018, nine Oklahoma City Police Department officers and one agent from the Bureau of Alcohol, Tobacco, Firearms, and Explosives, were assigned to assist Sergeant Harmon with executing the search warrant. Sergeant Harmon selected March 7 because he knew that Jenkins had a 10:00 a.m. court hearing that day concerning his June 2017 arrest. Sergeant Harmon wanted Jenkins away from the home while the officers executed the search warrant. He suspected that Jenkins had been involved with "drive-by shootings" and that Jenkins might have "a rifle inside the house," thus making him dangerous. R. vol. 2 at 8–9.

5

Sergeant Harmon and another officer, Lieutenant Merits, began surveilling Jenkins's house at about 8:45 a.m. A few minutes later, they "saw a woman, later determined to be Mr. Jenkins' mother [Lucretia Viewins]," leave the residence and put an object in the trunk of a black Chrysler 300. *Id.* at 9, 31. She went back inside the residence for about twenty minutes, and then she returned and sat in the driver's seat. Soon after, "a male subject that appeared to be Mr. Jenkins" emerged and sat in the passenger's seat, and the two drove away. *Id.* at 9. As Ms. Viewins turned south, Sergeant Harmon saw her fail to use her turn signal.

Sergeant Harmon advised Sergeant Rambo and Sergeant Fowler about the traffic violation. Those sergeants were waiting for "the target" at a fire station along Jenkins's route to the courthouse. *Id.* at 30–31. After Sergeant Rambo learned about Ms. Viewins's traffic violation, he followed her car and saw the Chrysler "straddle the lane lines twice." *Id.* at 31

When Ms. Viewins and Jenkins were about a mile and a half from the residence, Sergeant Rambo pulled over the Chrysler. Sergeant Rambo went to the passenger's side; Sergeant Fowler went to the driver's side. Once he had identified Jenkins, Sergeant Rambo asked him to step out of the car. Jenkins had one cell phone in his lap and another either there or nearby, and Sergeant Rambo asked if he would turn them over. Jenkins cooperated, turning over both his cell phones and stepping out of the car. After obtaining Jenkins's cell phones, Sergeant Rambo handcuffed Jenkins's hands behind his back, searched "his pockets for weapons," and "secured him in the back of [his patrol] car." *Id.* at 32.

6

Soon after Sergeant Rambo detained Jenkins in his patrol car, Sergeant Harmon arrived[8] and spoke with Ms. Viewins. Sergeant Harmon told her that he had a search warrant for the house and asked for the key so that he would not "have to break" the door in. *Id.* at 10. He also asked for her cell phone. Ms. Viewins gave Sergeant Harmon the key to the house and her cell phone but requested to be present while the officers executed the search warrant. When asked "whether or not there were other people in the house," Ms. Viewins told Sergeant Harmon that her sister was sleeping at the house and that "there might be a gun in her son's bedroom."[9] *Id.* at 10–11.

After obtaining, Ms. Viewins's statements, Sergeant Harmon met the other officers—i.e., the "search team"—at the fire station, and they put on their "vests and helmets" and made final preparations for executing the search warrant. *Id.* at 11. Sergeant Harmon did this while Sergeant Rambo and Sergeant Fowler watched Jenkins and Ms. Viewins, who both remained at the scene of the original stop. After donning their protective vests and helmets, Sergeant Harmon and the search team then drove back to the Wilshire residence. Sergeant Rambo transported Jenkins in his patrol car back to the residence, and Ms. Viewins drove herself.

---

[8] The district court found that Sergeant Harmon "arrived at about the time Defendant exited his mother's vehicle at Sergeant Rambo's instruction." R. vol. 1 at 102 n.3. But Sergeant Harmon testified that he "was close behind, but [he] wasn't right there when [Jenkins] was getting out of the vehicle[.]" R. vol. 2 at 22. Moreover, Sergeant Harmon testified that Jenkins was already secured in the patrol car by the time he arrived.

[9] Ms. Viewins did not testify at the suppression hearing.

When Sergeant Harmon reached the residence, he repeatedly knocked on the door while announcing that he had a search warrant. Though he heard Jenkins's aunt "say something," she would not open the door. *Id.* So the search team entered the residence using Ms. Viewins's key. Once inside, Sergeant Harmon asked Jenkins's aunt to wait on the porch, and he and the rest of the team then swept the residence, ensuring that no other people were inside the house. During the protective sweep, the search team saw in plain sight a Maadi 7.62 x 39 rifle. Having cleared the residence, Sergeant Harmon then went to a police van parked in the street outside, where Sergeant Rambo had placed Jenkins.

Special Agent Chad Oubre (the agent from the Bureau of Alcohol, Tobacco, Firearms, and Explosives) entered the house after the search team's initial sweep. On reaching the front porch, he smelled a "very strong" marijuana odor, and the odor grew stronger as he entered the house. *Id.* at 42. Special Agent Oubre walked through the kitchen into a garage, where he saw the Maadi assault rifle and a marijuana blunt.

Like Sergeant Harmon, Special Agent Oubre then went to the van to interview Jenkins. Sergeant Harmon and Special Agent Oubre gave Jenkins the *Miranda* warning, both orally and in writing, and Jenkins signed a waiver form. During the interview, Jenkins admitted that he had "purchased the [assault] rifle along with a .44 caliber revolver for $300 sometime in 2017" and had "smoked marijuana every day since he was 11[.]"[10] R. vol. 1 at 10; R. vol. 2 at 45. In addition, Jenkins "allowed

_____

[10] Technically, there were two interviews. Sergeant Harmon's audio recorder malfunctioned during the first interview, so he and Special Agent Oubre re-

8

officers to access his cellular phones, from which additional evidence was obtained."[11] R. vol. 1 at 98.

In the meantime, the search team continued searching. It seized ten items of evidence: (1) a "Taurus .44 magnum revolver," (2) the "Maadi 7.62 x 39 rifle," (3) "Miscellaneous ammunition," (4) "Miscellaneous shell casings," (5) "Four items of dominion and control-documents," (6) "One rifle magazine and two handgun magazines," (7) a "Pill bottle," (8) "Drug paraphernalia with residue," (9) "0.6 grams of powder field testing positive for both cocaine HCI and methamphetamine," and (10) a "Marijuana roach." *Id.* at 24.

On March 20, 2018, a grand jury indicted Jenkins on one count: "being an unlawful user of marijuana, methamphetamine, and cocaine" while knowingly possessing the Maadi assault rifle and Taurus revolver, in violation of 18 U.S.C. § 922(g)(3). *Id.* at 13–14.

### III.    Procedural Background

Jenkins filed two motions to suppress. In the first, he asserted that, under *Bailey v. United States*, 568 U.S. 186 (2013), his detention and resulting confession were invalid because the police detained him away from the immediate vicinity of his residence. In his second, he argued that "the Affidavit by Sgt. Harmon to obtain the

interviewed Jenkins. Neither Jenkins nor the government has included this second recording in the record.

[11] The record does not show what evidence Sergeant Harmon and Special Agent Oubre obtained from Jenkins's cell phones. Without identifying the evidence, Jenkins moved to suppress it in his first suppression motion.

Search Warrant was insufficient, on its face, to establish probable cause for the issuance of a warrant." R. vol. 1 at 32. In a single order, the district court denied both motions.

Starting with Jenkins's first motion, the court noted that, under *Michigan v. Summers*, 452 U.S. 692, 705 (1981), officers may detain an occupant while executing a search warrant, even without probable cause or reasonable suspicion. But the court agreed with Jenkins that, under *Bailey*, 568 U.S. at 199, such categorical detentions must occur within the "immediate vicinity of the premises to be searched." R. vol. 1 at 99 (internal quotation marks omitted). The court found that Jenkins had not been detained within the immediate vicinity of his residence—Sergeant Rambo seized him "at least 1.5 miles away[.]" *Id.* at 100. As a result, the court ruled that the categorical-detention rule was inapplicable.

But that did "not end the Court's inquiry," because it acknowledged that, even if the categorical-detention rule did not justify Jenkins's detention, ordinary Fourth Amendment principles still might: a suspect can be detained on reasonable suspicion or arrested on probable cause. *Id.* (citing *Bailey*, 568 U.S. at 202). Ultimately, the court concluded that Jenkins's stop was justified at its inception under *Terry v. Ohio*, 392 U.S. 1 (1968), and that the stop was lawfully extended. *Id.* at 101–03.

To explain, the court first reasoned that Ms. Viewins's initial traffic stop was supported by reasonable suspicion based on Sergeant Harmon's and Sergeant Rambo's observing Ms. Viewins's traffic violations. Next, the court concluded that, in addition to Ms. Viewins's stop, "[a] brief *Terry*-style stop of Defendant" was

10

reasonable based on two factors: "(i) Defendant's previous arrest for possession of drugs and associated paraphernalia and his possession of a handgun at the time and (ii) the materials recovered from the trash pull, both indicating that Defendant might be in possession of a firearm." *Id.* at 101. That said, the court recognized that because Jenkins was not temporarily detained, additional justification was needed to extend the *Terry* stop.

Though Jenkins was committing no crime in the car and was not armed, the court explained that "the *Terry* stop was reasonably extended based on 'an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring.'" *Id.* at 102 (quoting *United States v. Cervine*, 347 F.3d 865, 871 (10th Cir. 2003)). For support, the court cited the "pre-existing information available to Sergeant Harmon, combined with Defendant's mother's statement regarding the possible presence of a firearm at Defendant's residence[.]" *Id.* Significantly, the district court did not comment on a possible timing issue—Sergeant Rambo had already handcuffed and detained Jenkins in his patrol car before his mother gave her statement. Acknowledging that the issue presented a "close call," the court ultimately concluded that Jenkins's *Terry* stop was lawfully extended "through the time it took for officers to search his residence[.]" *Id.* at 102–03.

The court then addressed Jenkins's second motion to suppress. First, it ruled that, even if the tip were unreliable, "probable cause would likely still exist for issuance of the warrant, albeit barely." *Id.* at 105. As grounds, the court concluded that Jenkins and his past criminal activity were tied to the residence on account of the

11

tip, the Oklahoma Police Department and Oklahoma County jail records, and the vehicle-impound sheet. And the court ruled that evidence of what it considered additional criminal activity—the Ziploc baggie with methamphetamine residue and the Styrofoam tray with rifle ammunition—was linked to the residence in view of the trash pull.

Finally, the court concluded that Sergeant Harmon's omissions in the probable-cause affidavit did not warrant a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978). It ruled that Sergeant Harmon's failure to note that records of Jenkins's 2005 arrest appeared in only one Oklahoma database rather than two "was, at most, negligence on the part of Sergeant Harmon." R. vol. 1 at 109 (citation omitted). And it reasoned that Sergeant Harmon's failure to note that the tip concerned a "firearms offense" was irrelevant. *Id.* at 110 ("That suspicion existed in the minds of officers as to other crimes, if true, does not affect this case . . . .").

Accordingly, the court denied Jenkins's motions to suppress. Afterward, Jenkins signed a conditional plea agreement, reserving his right to appeal the district court's suppression order. On January 17, 2017, the court sentenced Jenkins to twenty-four months' imprisonment and three years' supervised release.[12] Jenkins now

---

[12] The Bureau of Prisons released Jenkins on November 19, 2019. Nonetheless, because a successful appeal may affect the length of his supervised release and overturn his conviction, Jenkins's appeal is not moot. *See, e.g.*, *United States v. Hasan*, 686 F.3d 1159, 1162 n.1 (10th Cir. 2012) (concluding that an appeal was not moot even though the appellant had "finished serving his sentence—including a period of supervised release"); *Prost v. Anderson*, 636 F.3d 578, 582 n.3 (10th Cir. 2011) (noting that past convictions can result in sentencing enhancements for future convictions).

appeals the district court's order, and we exercise appellate jurisdiction under 28 U.S.C. § 1291.

## DISCUSSION

### I. Standard of Review

When a defendant appeals the "denial of a motion to suppress, 'we review the district court's factual findings for clear error and consider the evidence in the light most favorable to the Government.'" *United States v. Edwards*, 813 F.3d 953, 959 (10th Cir. 2015) (quoting *United States v. Haymond*, 672 F.3d 948, 958 (10th Cir. 2012)). We "accord 'great deference' to the probable-cause assessment of the state court judge who issued the warrant." *United States v. Pulliam*, 748 F.3d 967, 971 (10th Cir. 2014) (quoting *United States v. Biglow*, 562 F.3d 1272, 1280–81 (10th Cir. 2009)). "'[A]fter-the-fact, de novo scrutiny' of a magistrate's probable-cause determination is forbidden." *Biglow*, 562 F.3d at 1281 (alteration in original) (quoting *Massachusetts v. Upton*, 466 U.S. 727, 733 (1984) (per curiam)); *see also Pulliam*, 748 F.3d at 971 (explaining that we defer to the warrant-issuing judge's conclusion that probable cause backed the warrant even if probable cause was borderline). Rather, we "review 'merely to ensure the Government's affidavit provided a "substantial basis" for reaching that conclusion.'" *United States v. Sadlowski*, 948 F.3d 1200, 1203 (10th Cir. 2020) (quoting *Biglow*, 562 F.3d at 1280).

### II. The Search Warrant

#### A. Probable Cause

The Fourth Amendment requires that search warrants be founded on probable cause: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ."[13] U.S. Const. amend. IV. To satisfy the probable-cause standard, police officers must demonstrate that "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Grubbs*, 547 U.S. 90, 95 (2006) (internal quotation marks and citation omitted). A "fair probability" is not an airtight guarantee; nor is it "proof that something is more likely true than false." *United States v. Denson*, 775 F.3d 1214, 1217 (10th Cir. 2014). Rather, a "fair probability," if placed on a hierarchy, ranks somewhere between a naked suspicion and a preponderance of the evidence. *Id.* (explaining that probable cause is "more than a 'bare suspicion' but less than a preponderance of the evidence" (quoting *United States v. Ludwig*, 641 F.3d 1243, 1252 & n.5 (10th Cir. 2011))). This standard is a low bar. *Kaley v. United States*, 571 U.S. 320, 338 (2014).

## B. The Search Warrant Was Supported by Probable Cause.

As discussed, Sergeant Harmon's affidavit relied on the following evidence: (1) the confidential informant's tip, (2) Oklahoma City Police Department and Oklahoma County jail records that both provided Jenkins's address, (3) Jenkins's vehicle-registration information, (4) Jenkins's 2005 drug-trafficking case and his

---

[13] The Fourth Amendment applies to the States through the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643, 655 (1961).

ongoing drug-related prosecution, and (5) the trash-pull evidence, including the methamphetamine residue, the rifle ammunition, and vehicle-impound sheet. On appeal, Jenkins asserts that (i) the tip was unreliable and irrelevant, (ii) Sergeant Harmon's failure to mention that the 2005 case had been expunged was an intentional omission, and (iii) the rifle ammunition cannot contribute to probable cause, because Jenkins was not yet a convicted felon.

For the sake of argument, we will assume that the tip, Jenkins's 2005 case, and the rifle ammunition cannot or do not assist in establishing probable cause. But because, even without this evidence, the affidavit still provided a "fair probability that contraband or evidence of a crime [would] be found in [the Wilshire residence]," *Grubbs*, 547 U.S. at 95 (internal quotation marks and citation omitted), we agree with the district court that the warrant was valid, *see United States v. Cusumano*, 83 F.3d 1247, 1250 (10th Cir. 1996) (en banc) ("In our review, we may disregard allegedly tainted material in the affidavit and ask whether sufficient facts remain to establish probable cause." (citations omitted)).

To start, Sergeant Harmon confirmed that Jenkins lived at the Wilshire residence by checking Oklahoma City Police Department, Oklahoma County jail records, and Jenkins's vehicle-registration information. In addition, Sergeant Harmon found a vehicle-impound sheet from Jenkins's June 2017 arrest in the trash outside of the residence. And Jenkins himself claims that "[s]urely other records available to the affiant connected Mr. Jenkins to the address." Appellant's Principal Br. 12.

15

In connection with his criminal history, Jenkins's residing at the residence is a relevant factor in our probable-cause calculus. Though "[c]riminal history alone is not enough to support a finding even of reasonable suspicion, much less probable cause," it "can support a finding of reasonable suspicion or probable cause" when "combined with other factors[.]" *United States v. Artez*, 389 F.3d 1106, 1114–15 (10th Cir. 2004) (citations omitted). Other circuit courts are in step with *Artez*, treating a suspect's criminal history—particularly past convictions or arrests analogous to the criminal activity under investigation—as probative to the probable-cause analysis. *E.g.*, *United States v. Green*, 897 F.3d 173, 187 (3d Cir. 2018); *United States v. Perkins*, 850 F.3d 1109, 1120 (9th Cir. 2017); *United States v. Dyer*, 580 F.3d 386, 392 (6th Cir. 2009); *see also* 2 Wayne R. LaFave, Search and Seizure § 3.2(d) (5th ed., Oct. 2019 update). In *Artez*, in concluding that a search warrant for a residence was based on probable cause, we relied (in part) on evidence that four of the inhabitants "had prior convictions for narcotics-related offenses" and "one of the residents had an active arrest warrant for possession of drug paraphernalia."[14] 389 F.3d at 1115.

Here, Sergeant Harmon noted that the State of Oklahoma was currently prosecuting him on charges from his earlier "possession of 4.3 grams of a substance filed [sic] testing positive for methamphetamine, 572 pills identified as Alprazolam,

---

[14] In addition to challenging his 2005 conviction, Jenkins argues that his 2017 arrest and ongoing prosecution were stale as evidence of his ongoing drug activity because he was arrested "8 months earlier." Appellant's Principal Br. 12. We fail to see how the pending 2017 case is stale. If courts can rely on past convictions without deeming them stale, surely the same holds true for ongoing prosecutions.

16

483 pills identified as ecstasy, 0.6 grams of marijuana, and various drug paraphernalia including a digital scale." R. vol. 1 at 26. This June 2017 drug-related conduct was not remote from the February 28, 2018 search warrant. Though this previous arrest—for which Jenkins was currently being prosecuted—was not enough by itself to establish probable cause that he had drugs in his home, it certainly increased the likelihood that drugs would be found there during a search. *Compare United States v. Sanchez*, 555 F.3d 910, 914 (10th Cir. 2009) ("[W]e think it merely common sense that a drug supplier will keep evidence of his crimes at his home."), *with Artez*, 389 F.3d at 1114–15 (noting that criminal history cannot by itself establish probable cause but reasoning that the residents' drug-related criminal history increased the possibility "that drugs or related contraband was likely to be found at that location").

But what made such an outcome even more likely was that Sergeant Harmon found a small baggie containing methamphetamine residue in the trash outside of the Wilshire residence. In *United States v. Colonna*, 360 F.3d 1169, 1173, 1175 (10th Cir. 2004), *overruled on other grounds by United States v. Little*, 829 F.3d 1177 (10th Cir. 2016), the defendant argued that evidence a deputy found during a single trash pull—"two burnt roach ends of suspected marijuana cigarettes, a 'twist' torn from the corner of a plastic baggie, a plastic baggie with a corner torn from it, and an empty container of Zig Zag cigarette papers"—showed "only personal use of marijuana by someone in the residence[.]" He asserted "that personal use alone does not justify the search of a home." *Id.* at 1175. Rejecting that argument, we concluded

17

that the evidence showed that someone in the residence was using drugs, an act that in turn supported "a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)); *see also id.* at 1174 (noting that probable cause existed without other statements in the deputy's affidavit because "the assertions concerning the evidence obtained from the trash [pull] support[ed] probable cause"). If an amount of marijuana consistent with "only personal use" was sufficient for a search warrant in *Colonna*, the methamphetamine residue in this case, along with Jenkins's ongoing prosecution for drug crimes, was more than enough.

Out-of-circuit authority also supports this conclusion. In *United States v. Briscoe*, 317 F.3d 906, 907–08 (8th Cir. 2003), the Eighth Circuit addressed whether, standing alone, "forty marijuana seeds and twenty-five marijuana stems" that officers found during a single trash pull supported probable cause for a search warrant. The Eight Circuit held that "the marijuana seeds and stems in Briscoe's garbage were sufficient *stand-alone* evidence to establish probable cause," reasoning that "the presence of discarded marijuana stems and seeds reasonably suggest that ongoing marijuana consumption or trafficking is occurring within the premises[.]" *Id.* at 908. Likewise, in this case the presence of methamphetamine residue in the trash reflected ongoing methamphetamine use by someone in the Wilshire residence.

On the other hand, some recent cases have reasoned that more than a single trash pull is needed to support probable cause, particularly when the trash pull

18

uncovers a small quantity of drugs.[15] For instance, in *United States v. Abernathy*, 843 F.3d 243, 248 (6th Cir. 2016), the probable-cause affidavit omitted the defendant's criminal history, even though the "Defendant had a lengthy history of drug and weapons charges[.]" Unable to rely on this "*critical* missing ingredient," the court ruled that, standing alone, a single trash pull that uncovered evidence of marijuana use was insufficient to support probable cause for a search warrant. *Id.* at 255–57 (emphasis added) (citation omitted).

But *Abernathy*'s critical ingredient is present and potent here: Sergeant Harmon's affidavit underscored that the State of Oklahoma was currently prosecuting Jenkins for serious drug-related crimes. Mixed together, Jenkins's ongoing drug prosecution augmented the probable-cause value of the methamphetamine residue.[16] Remaining mindful that we must defer to the issuing-judge's probable-cause conclusion "even in a 'doubtful or marginal case,'" *Pulliam*, 748 F.3d at 971 (citation

---

[15] *See, e.g.*, *United States v. Lyles*, 910 F.3d 787, 791–92, 793–94 (4th Cir. 2018); *United States v. Leonard*, 884 F.3d 730, 734–35 (7th Cir. 2018); *United States v. Abernathy*, 843 F.3d 243, 255–57 (6th Cir. 2016).

[16] Jenkins also argues that, "[a]ssuming weekly garbage collection," the trash-pull evidence was stale because it may have been sitting outside the residence for as long as seven days before the February 27 trash pull. *See* Appellant's Principal Br. 11. But whenever the methamphetamine residue was placed in the trash, the fact remains that Sergeant Harmon found it outside of the residence on February 27. *See United States v. Le*, 173 F.3d 1258, 1261, 1266–67 (10th Cir. 1999) (judging whether methamphetamine found during a trash pull was stale based on when officers found it, not based on some hypothetical date when it might have been placed in the trash). When he applied for and received a search warrant the next day, the February 27 evidence was far from stale. *See United States v. Thurmond*, 782 F.3d 1042, 1046 (8th Cir. 2015) ("Seeking the warrant [two days after] the initial trash pull did nothing to lessen the probable cause determination." (citation omitted)).

omitted), we hold that Jenkins's ongoing drug-related prosecution and the trash-pull evidence, when combined together, supplied probable cause to believe that evidence of drug use or drug possession would be found at the Wilshire residence.

## III.    Jenkins's Traffic Detention and Confession

Next, we address Jenkins's argument that Sergeant Rambo unlawfully detained him by handcuffing him and transporting him back to the Wilshire residence after the roadside stop. We have serious concerns about the district court's ruling on this issue—Jenkins's pat down had showed that he was unarmed, Ms. Viewins did not tell Sergeant Harmon about the firearm in Jenkins's room until *after* Sergeant Rambo had handcuffed and detained Jenkins, and by handcuffing Jenkins and transporting him to the residence for interrogation, Sergeant Rambo arguably exceeded the scope of a permissible *Terry* stop. *See Dunaway v. New York*, 442 U.S. 200, 212, 216 (1979) (concluding that the defendant's detention was an arrest, not a *Terry* stop, when "he was taken from a neighbor's home to a police car, transported to a police station, and placed in an interrogation room").

But Jenkins briefs none of these issues. Instead, he quotes *Summers* for three points. *See* 452 U.S. at 702–03. First, he states that "minimizing the risk of harm to the officers" while they executed the search warrant was not at issue, because Jenkins had left the Wilshire residence and the officers knew where he was going. Appellant's Principal Br. 15 (internal quotation marks omitted). Second, he asserts that "the efficiency of the search being 'facilitated if the occupants of the premises are present,' was not a factor," because Ms. Viewins had given Sergeant Harmon the

key to the residence and Jenkins had already been detained. *Id.* at 15–16. Third, he claims that "'the legitimate law enforcement interest in preventing flight in the event that incriminating evidence is found[]' was non-existent," because Jenkins and Ms. Viewins would have been unaware of the search warrant had Sergeant Rambo not stopped them. *Id.* at 16.

The Court in *Summers* relied on these three concerns to justify the categorical-detention rule. *See Bailey*, 568 U.S. at 194 ("In *Summers*, the Court recognized three important law enforcement interests that, taken together, justify the detention of an occupant who is on the premises during the execution of a search warrant: officer safety, facilitating the completion of the search, and preventing flight." (citation omitted)). So Jenkins has confined his argument on appeal to explaining why a *Summers* categorical detention was unjustified.

But the district court agreed with him on that point, ruling that a *Summers*-type detention was inappropriate because Jenkins had been detained far away from his home. R. vol. 1 at 100 ("Here, the Court agrees with Defendant that, per *Bailey*, a *Summers*-allowed detention made incident to the search of his residence does not authorize Defendant's seizure at least 1.5 miles away—a distance farther than that disallowed in *Bailey*." (citation omitted)). Even so, the court concluded that the stop and continued detention were reasonable under *Terry* principles. Jenkins's briefing provides only one sentence in response to that key ruling: "Mr. Jenkins respectfully disagrees." Appellant's Principal Br. 15. Yet his briefing casts no light on why he disagrees. Indeed, in the Summary of the Argument section of his brief, Jenkins

21

frames his appellate challenge this way: "Mr. Jenkins' detention away from his residence and returning him to the residence violated *Bailey*." *Id.* at 8. But that establishes nothing—the district court said as much by ruling that *Bailey* "disallowed" a categorical detention because he had been detained "at least 1.5 miles away" from his home. With everyone in agreement on that point, the issue on appeal is whether Jenkins's extended detention violated *Terry*, a topic Jenkins never tackles.

In view of this briefing problem, the government argues that Jenkins has waived his appellate challenge on this issue. *See, e.g.*, *Burke v. Regalado*, 935 F.3d 960, 1014 (10th Cir. 2019) ("'Cursory statements, without supporting analysis and case law' are inadequate to preserve an issue." (citation omitted)); *United States v. Walker*, 918 F.3d 1134, 1152 (10th Cir. 2019) (deeming the government-appellant's argument waived when its "briefing demonstrate[d] a lack of meaningful interaction with the district court's . . . analysis"); *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 679 (10th Cir. 1998) ("Arguments inadequately briefed in the opening brief are waived . . . ." (citations omitted)). We agree. Even liberally construed, Jenkins's entire appellate argument focuses solely on why the district court correctly ruled that a *Summers* detention was inappropriate, not why the district court incorrectly ruled that Jenkins's extended detention was valid under *Terry*.[17] At this point, the only way

---

[17] That Jenkins's arguments relate to only *Summers* and not *Terry* is clear by how he sums up his brief: "'The *Summers* exception is appropriately predicated *only* on law enforcement's interest in carrying out the search unimpeded by violence or other disruptions.' (*Summers*, Scalia, J., concurring))." Appellant's Principal Br. 16. But, as discussed, whether a *Summers* categorical detention was justified is not at issue—the district court did not apply the *Summers* exception. We also note that

22

we could consider a challenge to the district court's *Terry* analysis would be by divining our own challenge. But "[i]t is not our role to sift through the record to find evidence not cited by the parties to support arguments they have not made." *Cordova v. Aragon*, 569 F.3d 1183, 1191 (10th Cir. 2009) (citation omitted).

Moreover, we have explained that "[w]hen an appellee advances an alternative ground" to affirm, and the appellant fails to reply to the appellee's argument, the appellant "waives, as a practical matter anyway, any objections not obvious to the court to specific points urged by the appellee." *Hasan v. AIG Prop. Cas. Co.*, 935 F.3d 1092, 1099 (10th Cir. 2019) (internal quotation marks and citations omitted); *see also Eaton v. Pacheco*, 931 F.3d 1009, 1031 (10th Cir. 2019) ("Notably, Eaton doesn't respond to the state's mootness argument in his reply brief. Accordingly, we treat any non-obvious responses he could have made as waived and assume the state's mootness analysis is correct." (citing *Hardy v. City Optical Inc.*, 39 F.3d 765, 771 (7th Cir. 1994))), *cert. denied*, No. 19-7810, 2020 WL 2515699 (U.S. May 18, 2020). Here, on top of its waiver argument—which is itself an alternative ground for a non-merits affirmance—the government provides a thorough analysis about how, "even if this Court were to find that Mr. Jenkins was illegally detained," we should affirm on an alternative ground: the attenuation doctrine. Appellee's Br. 32–37; *see also Brown v. Illinois*, 422 U.S. 590, 603–04 (1975).

---

Justice Scalia authored this concurrence in the *Bailey* decision, not *Summers*. *See Bailey*, 568 U.S. at 203–06 (Scalia, J., concurring).

In his briefing, Jenkins's sole discussion about the attenuation doctrine is to acknowledge that the district court did not reach the attenuation issue. He provides no argument against its application—indeed, he does not even cite *Brown*. And, as mentioned, Jenkins chose not to file a reply brief. Thus, Jenkins has waived any non-obvious responses to the government's attenuation analysis, and we see no obvious flaws in the government's reasoning. Likewise, we see no obvious rejoinders to or errors in the government's waiver analysis. Hence Jenkins's waiver is twofold—his brief does not challenge the district court's *Terry* ruling, and he did not reply to the government's alternative grounds for upholding the district court's ruling.

## CONCLUSION

We affirm the district court's dismissal of Jenkins's motions to suppress.

Entered for the Court

Gregory A. Phillips
Circuit Judge

24